**McGARTY v. O'BRIEN, Warden.**

No. 4559.

United States Court of Appeal<br>
First Circuit.

March 29, 1951.

Writ of Certiorari Denied May 7, 1951.

See 71 S.Ct. 794.

James Seligman, Fall River, Mass. (William C. Crossley, Fall River, Mass., on brief), for appellant.

Henry P. Fielding, Asst. Atty. Gen., Massachusetts (Francis E. Kelly, Atty. Gen., Massachusetts, and Maurice M. Lyons, Dist. Atty., So. Dist. of Massachusetts, New Bedford, Mass., on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

In the order now under review, the district court dismissed a petition by Charles McGarty for a writ of habeas corpus directed to the Warden of the Massachusetts State Prison. A certificate of probable cause was signed by the district judge under 28 U.S.C.A. § 2253. An earlier attempt by the same petitioner to invoke the aid of the federal courts is reported in our decision in McGarty v. O'Brien, 1 Cir., 1950, 180 F.2d 987, certiorari denied, 1950, 339 U.S. 966, 70 S.Ct. 1002. The claim is that a conviction for murder was obtained in violation of the Fourteenth Amendment in that the trial court denied a motion on behalf of petitioner, an indigent accused with court-appointed coun-

sel, to be allowed to employ alienists at state expense.

On August 4, 1947, McGarty brutally killed his eight-year-old niece. Thereafter the grand jury for the County of Bristol, Massachusetts, returned an indictment against him for murder, to which he pleaded not guilty. McGarty filed a motion in the Superior Court setting forth that he was charged with a capital crime and was without funds to procure counsel, and requesting the court to assign James Seligman, Esq., as his counsel. The request was granted.[1]

McGarty had orally admitted the killing, and later had signed a written confession in revolting detail. The circumstances of the confession offered little or no opening for the contention that the confession was other than voluntary. In undertaking the defense, assigned counsel faced a bleak prospect, unless he could develop a jury issue on the sanity of the accused.

This being a capital case, it was mandatory under the so-called Briggs Law, Mass.G.L. (Ter. Ed.) c. 123, § 100A, as amended by St.1941, c. 194, § 11, for the clerk of the Superior Court to give notice to the Department of Mental Health, which "shall cause such person to be examined with a view to determine his mental condition and the existence of any mental disease or defect which would affect his criminal responsibility." The statute directs that the report from the Department of Mental Health be filed with the clerk of the court, where it is to be made accessible to the court, the probation officer, the district attorney, and the attorney for the accused. Pursuant to the Briggs Law, McGarty was examined on behalf of the Department of Mental Health by Doctors R. M. Chambers and Roderick B. Dexter. Their joint report, which was duly filed in court December 23, 1947, found that McGarty "is neither feeble minded nor insane, and that he does know the difference between right and wrong. We do believe, however, that the anti-social tendencies which he has presented since early childhood warrant a diagnosis of Psychopathic Personality and he has been so classified." Finally, the report concluded with the expression of opinion that "this prisoner is not suffering from any mental disease or defect which would affect his criminal responsibility."

The defense could have called Dr. Chambers and Dr. Dexter as witnesses, but in view of the conclusions reached in their report counsel naturally wanted to seek out other experts whose opinion, after psychiatric examination, might be more favorable to the defense of insanity. In this somewhat nebulous field, one could not say with confidence that such a search would have been futile, had the defense had funds wherewith to employ other experts. The very category "psychopathic personality" into which McGarty was placed by the report of Dr. Chambers and Dr. Dexter is a rather blurred classification which in current acceptation embraces widely varying types of personality disorders with dissimilar characteristics. See the article, "Psychopathic Personality," by Dr. Hervey Cleckley, Professor of Neuropsychiatry, University of Georgia Medical School, in the Encyclopedia of Criminology, edited by Doctors Branham and Kutash (1949). In this article Dr. Cleckley points out that many patients classed as psychopathic personalities "who are entirely free of symptoms indicating psychosis by the theoretical standards show themselves far less fitted for unrestricted life in the social group than schizophrenic patients who are hallucinating and delusional. The fact that, according to our present official standards of classification, patients disordered in this particular way must be diagnosed as *psychopathic personality* brings about regretable and sometimes farcical confusion, since this diagnosis, by definition, whatever the facts of conduct may be, establishes the patient as free from psychosis and usually forces the courts to pronounce him

---

1. Under § 55 of c. 277, Mass.G.L.(Ter. Ed.), the court may allow "reasonable compensation" to such assigned counsel for his services, the compensation to be paid by the county wherein the indictment was found. See also Rule 95 of the Superior Court Rules, under which a maximum compensation of $1,000 may be allowed by the court.

as legally sane and competent." Further, Dr. Cleckley observes that if such patients "who are readily distinguishable, could be removed from the official medical classification where they are for purposes of diagnosis identified with dissimilar conditions, it is probable that their status could in time be considered in relation to facts rather than theories and that, when incompetent, they could be so pronounced medically and legally. They could then be protected and dealt with by medical procedures as are other patients affected with personality disorders." We quote this reference merely as tending to indicate that, despite the conclusions in the report by Doctors Chambers and Dexter, there might be other psychiatrists, equally reputable, whose opinions would have afforded support to a legal defense of insanity sufficient to make it a jury issue.

Under § 56 of c. 277, Mass.G.L. (Ter. Ed.), "reasonable expenses incurred and paid by counsel assigned by the court for the defence of a person indicted for murder, who is otherwise unable to procure counsel, shall be paid by the county where the indictment is found after approval by a justice sitting at the trial or other proceedings of the case." However, Rule 96 of the Superior Court Rules provided: "The court will not allow compensation for the services of an expert or expert witness for the defense in a capital case unless an order of the court or a justice, naming such expert or expert witness and authorizing his employment, was made before he was employed."

Having in view the foregoing provision of law and rule of court, counsel for McGarty, on January 15, 1948, filed a motion in the Superior Court asking that the defendant, being without funds, "be allowed to employ two psychiatrists at the expense of the Commonwealth so that he may properly defend himself against the crime as charged by the Commonwealth." This motion was denied, to which exception was saved. McGarty went to trial, the jury brought in its verdict of murder in the first degree, and he was sentenced to death.

On appeal to the Supreme Judicial Court from the judgment of conviction, one of the errors assigned was the denial by the Superior Court of the defendant's motion to be allowed to employ psychiatric experts at the expense of the Commonwealth. It appears that the alleged error of the Superior Court in this regard was not presented as raising a question of federal constitutional law, but rather was predicated upon the contention that it was an abuse of discretion under the circumstances to deny defendant's motion made under the local statute, § 56 of c. 277, Mass.G.L. (Ter. Ed.). At any rate, the opinion of the Supreme Judicial Court indicated no awareness that a federal constitutional question was presented for decision. After referring to the conclusion of the report by Doctors Chambers and Dexter, the court said, Com. v. McGarty, 323 Mass. 435, at page 437, 82 N.E.2d 603, at page 605: "We assume that the judge could have granted the motion under G.L. (Ter. Ed.) c. 277, § 56. But the matter was discretionary. Nothing in the medical report and nothing in the record indicated that the defendant was not mentally responsible. We find no error in the denial of the motion." Other alleged errors were found to be without merit. The judgment of conviction was affirmed. Commonwealth v. McGarty, 1948, 323 Mass. 435, 82 N.E.2d 603.

Upon such affirmance of conviction the defendant did not apply to the Supreme Court of the United States for a writ of certiorari. The failure to apply for certiorari at this point is of no consequence; we think the Supreme Court would have had to deny certiorari, since no federal question had been properly presented, or passed upon, in the state courts. Cf. Darr v. Burford, 1950, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761.

Thereafter McGarty filed in the United States District Court for the District of Massachusetts his first petition for a writ of habeas corpus. The petition set forth that the Superior Court had denied petitioner's motion that he be allowed, at the expense of the Commonwealth, "to employ medical experts to impartially examine him, and to be used, if necessary, as witnesses in his behalf"; that the denial of such motion had been affirmed on appeal;

"that the petitioner was at the time and still is without funds, and that the denial of this opportunity to be examined by impartial medical witnesses was in violation of his constitutional rights under the Fourteenth Amendment of the Constitution, that he believes he is entitled to redress, that all his State remedies have been exhausted". By order of July 26, 1949, the district judge dismissed the petition without prejudice, on the ground that petitioner had not exhausted his state remedies. D.C., 85 F.Supp. 415. We affirmed this order of dismissal, on the same ground, in McGarty v. O'Brien, 1 Cir., 1950, 180 F.2d 987, certiorari denied, 1950, 339 U.S. 966, 70 S.Ct. 1002.

Petitioner then filed a petition for a writ of error, under the provisions of Mass. G.L. (Ter. Ed.) c. 250, § 11, before a single justice of the Supreme Judicial Court. This petition was based upon the explicit claim that the denial by the Superior Court of McGarty's motion for leave to employ medical experts at the expense of the Commonwealth was in violation of his constitutional rights under the Fourteenth Amendment and rendered his conviction and sentence illegal and void. The single justice denied the application for a writ of error, to which denial petitioner took exceptions, which were heard by the full bench of the Supreme Judicial Court. On November 6, 1950, that court rendered its decision overruling petitioner's exceptions. McGarty v. Commonwealth, Mass., 95 N.E. 2d 158, 160. The Supreme Judicial Court rested its decision on two grounds: (1) Issuance of a writ of error upon a judgment for a capital offense rested in the sound discretion of the single justice. In his appeal from the judgment of conviction, 323 Mass. 435, 82 N.E.2d 603, McGarty had "asserted the same alleged error which he now asserts;" he had "argued the point upon such grounds as he saw fit"; and the Supreme Judicial Court had "decided the point against him upon grounds which it deemed sufficient." A court of appeal "does not commonly reconsider on a later appeal a matter previously decided on an earlier appeal." Therefore, the court concluded, "even if the single justice could have granted the writ, which we need not decide, his refusal to grant it was at least within the limits of a sound and reasonable judicial discretion". (2) As a second ground for denying petitioner's exceptions, the Supreme Judicial Court examined into petitioner's federal constitutional point on the merits, and rejected it.

Following the overruling by the Supreme Judicial Court of his exceptions in the writ of error proceeding, McGarty applied for a writ of certiorari, which was denied. McGarty v. Com. of Massachusetts, 1950, 340 U.S. 886, 71 S.Ct. 199. Of course, we do not know why certiorari was denied, though it may well have been on the view that the judgment of the Supreme Judicial Court was supportable upon an adequate non-federal ground. Under the circumstances, we are quite clear that the constitutional question which McGarty raised in the writ of error proceeding and which the Supreme Judicial Court passed upon adversely, remained open for consideration and determination in subsequent habeas corpus proceedings in the federal courts, despite such denial of certiorari. See White v. Ragen, 1945, 324 U.S. 760, 765, 767, 65 S.Ct. 978, 89 L.Ed. 1348; Darr v. Burford, 1950, 339 U.S. 200, 215, 70 S.Ct. 587, 94 L. Ed. 761; Dowd v. United States ex rel. Cook, 1951, 340 U.S. 206, 71 S.Ct. 262.

On November 27, 1950, McGarty filed in the court below a new petition for habeas corpus, alleging again that the denial by the Superior Court of his motion "that he be allowed, at the expense of the Commonwealth, to employ medical experts to impartially examine him, and to be used, if necessary, as witnesses in his behalf" was in violation "of his Constitutional Rights under the Fourteenth Amendment of the Constitution," and reciting the various prior proceedings as establishing that he had now exhausted his state remedies. The district court, after a hearing on the petition and answer of respondent to a show cause order, found adversely to the petitioner on the merits of his constitutional claim, and on February 14, 1951, entered an order dismissing the petition and denying the writ. The present appeal is from that order.

While we do not think that appellant's constitutional argument may fairly be char-

acterized as frivolous, we have reached the conclusion, after careful consideration, that the point is not well taken.

In Avery v. Alabama, 1940, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377, the Court said: "But the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." By analogy, it is argued that something more than time must be afforded to assigned counsel for an indigent accused, that the state is also obliged, under the requirements of fundamental fairness implicit in the due process clause, to make available to assigned counsel such financial means as may be necessary to enable him to develop and present an appropriate defense; otherwise, the constitutional right to court-appointed counsel would be an empty and illusory one. The contention suggests a broad vista of litigation and a considerable enlargement of potential issues in habeas corpus cases, which we would be loathe to stimulate unduly by incautious dicta beyond the requirements of the particular case before us. Obviously enough, an indigent defendant with assigned counsel may be at a disadvantage as compared with a wealthy defendant having unlimited means for the hiring of investigators, of various sorts of expert witnesses, of a battery of lawyers. It is indeed not only the wholly indigent defendant who is subject to this disadvantage, but also accused persons of small means who still have money enough to employ counsel of their own choice. Such disadvantage, of course, is not imposed by the state, but results from the financial situation in which the accused finds himself. How far the state, having the obligation to afford to the accused a fair trial, a fair opportunity to make his defense, is required under the due process clause to minimize this disadvantage is a matter which, in other contexts, may deserve serious examination.

The issue presented for decision in the present case is a much narrower one. This is not a case where the state has refused to provide an impartial psychiatric examination of the accused with a view to determining his sanity and criminal responsibility. Quite the contrary, in compliance with a mandatory provision of law, the state has, at public expense, provided such examination by two impartial experts; and their joint report has been made available to the defense. The doctors designated by the Department of Mental Health to make the examination are not partisans of the prosecution, though their fee is paid by the state, any more than is assigned counsel for the defense beholden to the prosecution merely because he is, as here, compensated by the state. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of the accused.

In enacting the Briggs Law, the legislature was interested only in the impartial ascertainment of the truth as to the mental condition of the accused in its bearing on his criminal responsibility or on the way he ought to be dealt with by the agencies concerned. In Commonwealth v. Devereaux, 1926, 257 Mass. 391, 396, 153 N.E. 881, 882, Rugg, C. J., stated: "It is a matter of general knowledge that there are in the service of the commonwealth under this department persons eminent for special scientific knowledge as to mental diseases. The examination under the statute, therefore, may fairly be assumed to have been made by competent persons, free from any predisposition or bias and under every inducement to be impartial and to seek for and to ascertain the truth." For the genesis of the legislation, see a statement by Dr. L. Vernon Briggs, "Conditions and Events Leading to the Passage of the Massachusetts Law Commonly Called the Briggs Law," 12 Bulletin Mass. Dept. of Mental Diseases (Oct. 1928) 2, 5. Dr. Briggs explained: "Before this law was passed the procedure employed in ascertaining the mental responsibility of persons accused of crime was almost inconceivably

futile, cruel and wasteful. Hardly a day passed, and certainly never a week without the spectacle in some one of our courts of two or more physicians, possibly graduates of the same medical school, and belonging to the same scientific and medical societies, pitted against each other, testifying to diametrically opposite opinions as to the mental condition and responsibility of the person in question." As a result, psychiatric specialists were subject to ridicule in the press; juries seldom got "an unbiased scientific opinion, for no sooner had one side employed an expert in mental disease than the other invariably engaged another alienist, of whom there were some to be found who could be employed to offset their rivals' testimony." After some years' experience with the operation of the law, Dr. Briggs was able to report: "The reputation for unbiased and scientific administration of this law held by the Department of Mental Diseases in Massachusetts and the realization by the courts and juries that psychiatrists when not partisans can help them makes for the continued success of the law. The virtual elimination of contending medical men in criminal trials has raised the medical profession in the opinion of the public and of the press. Instead of the common spectacle of members of the medical profession pitted against each other, we have since the law was passed in 1921 an average of less than one case a year in which psychiatrists have testified in opposition in the same criminal case. Thousands and thousands of dollars have been saved, not only to the State but to the defendants, and our mentally sick offenders, instead of being executed or punished by imprisonment and perhaps turned loose in a few years in an irresponsible condition to commit further crimes, thus becoming recidivists, are placed in hospitals where they remain, perhaps for life, unless they fully recover, and both they and the public are protected."

Another authority, Dr. Winfred Overholser, comments that "the examination is made by a *neutral* agency which is not only not retained by either prosecution or defense but which is not even an agency of the court. The examination is made by trained psychiatrists who are free of any preformed assumptions or bias, and are seeking only to find the truth regardless of whose side it may favor." Overholser, "The Practical Operation of the Massachusetts Law Providing for the Psychiatric Examination of Certain Persons Accused of Crime," 12 Bulletin Mass. Dept. of Mental Diseases (Oct., 1928) 5, 10. He goes on to say: "As a result of the neutral and impartial status of the examiners, occasion to employ the services of partisan experts in criminal cases has practically entirely ceased to exist. The clashes of such experts which are all too familiar in some jurisdictions are now virtually unknown in Massachusetts, almost entirely on account of this beneficent provision of the law. If by no other accomplishment than the rehabilitation of expert testimony the law has amply justified its existence."

See also a later study by Dr. Overholser, "The Briggs Law of Massachusetts: A Review and an Appraisal," 25 J.Crim.L. & Criminology 859 (1935). In an article, "Psychiatric Examination of Persons Accused of Crime," 36 Yale L.J. 632, 633, 647 (1927), Professor Sheldon Glueck appraises the Briggs Law as an enlightened piece of legislation which "aims at making the mental examination of those indicted for certain classes of crimes a *routine matter* not dependent upon the expert knowledge, alertness, desire or caprice of those temporarily in charge of the accused." He emphasizes the advantage that the psychiatric examinations are made by a neutral, unbiased agency instead of by partisan experts, to which he attributes the fact that "the law has brought about a marked diminution in the use of conflicting alienists in insanity cases". A very recent study, "Examination of the Accused in Massachusetts (1921–1949)," by Dr. Peter B. Hagopian, Assistant Commissioner, Mass. Dept. of Mental Health, 107 American Journal of Psychiatry 336, 338 (Nov. 1950), confirms the earlier reported experience that, as a rule, "the opinion of the experts is cordially accepted by the courts, and the attorneys for the defense and the prosecution."

Although the Briggs Law has been justly credited with the desirable consequence of having sharply curtailed the number of unseemly disputations between psychiatric experts in criminal trials, it is true that examination and report by the psychiatrists appointed by the Department of Mental Health does not legally preclude the introduction of expert witnesses by the defense in contradiction of the conclusions of the report by such designated impartial psychiatrists. Appellant's contention comes to this, that the state has the constitutional obligation to promote such a battle of experts by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused is criminally insane. We do not think that this is so, at least in a case like the present, where there has been no challenge of the professional standing and competence of the psychiatrists whose examination and report has been furnished at state expense, and no question has been raised as to their complete impartiality or as to the thoroughness of their examination of the accused.

■ It turned out that the report in this case by Doctors Chambers and Dexter was not useful to the defense in establishing a legal defense of insanity, because of the conclusion which these impartial psychiatrists arrived at. But suppose the defense motion had been granted here, and assigned counsel had been authorized to employ two other experts to examine the accused: The two so chosen might, after examination of the defendant, have arrived at the same professional conclusion stated in the report of the psychiatrists designated by the Department of Mental Health. Would the defendant then be entitled to further financial assistance from the state to continue the search, merely because a defendant of ample private wealth would perhaps have been able eventually to find a more favorable psychiatrist somewhere in the United States, or even in Europe? We would think not; examination and report by two competent and impartial experts supplied at state expense is enough, we think, to satisfy the state's constitutional obligation under the due process clause. In the absence of some authoritative precedent to the contrary, we are unwilling to say, under all the circumstances here present, that the Superior Court's denial of the defense motion violated "a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Bute v. Illinois, 1948, 333 U.S. 640, 659, 68 S.Ct. 763, 773, 92 L.Ed. 986.

In the memorandum of decision filed by the court below, it is stated: "It became inescapably clear at the hearing on this petition that it has been the custom and practice of Superior Court judges to allow a motion to employ medical experts in circumstances similar to those in the instant case. Search by counsel for petitioner and for the Commonwealth has failed to produce another instance in which such a motion has been denied." D.C., 96 F.Supp. 704, 707. If the Superior Court in the present case, without any rational ground of differentiation, singled out McGarty for discriminatory treatment contrary to hitherto invariable practice of Massachusetts courts in such cases, this would present a question of denial of equal protection of the laws rather than of due process. It does not appear that petitioner has ever presented to the state court any such claim of denial of the equal protection of the laws; nor indeed did he make such claim in his pending petition for habeas corpus. Before a federal court would be justified in granting relief on this basis, the petitioner would first have to present such claim to the state courts, by whatever corrective process might be available. Since the granting of a motion for leave to employ experts, under § 56 of c. 277, Mass. G.L. (Ter.Ed.), rests in the discretion of the Superior Court judge, it would be difficult to establish that denial of such motion in the present case was an invidious and purposeful discrimination; and certainly the circumstances of the other cases in which a similar motion was granted would have to be thoroughly examined in order to determine whether there might not have been some distinguishing factors. We have decided the present case only on the claim of denial of due process, and we do not

think that there is properly presented for our decision any such further question as to a possible denial of equal protection of the laws. In this connection we note that, contrary to the statement quoted above from the memorandum of decision of the district court, there is at least one reported case where the Superior Court did deny a motion like that made by McGarty in the case at bar. We refer to Commonwealth v. Belenski, 1931, 276 Mass. 35, 176 N.E. 501. In that case the defendant was under indictment for murder. The report of the psychiatrists who examined the defendant in pursuance of the Briggs Law stated, as appears from the record in the case: "Only simple psychometric tests possible and are not reliable due to lack of education and limited mental grasp. Intelligence inferior but he is not definitely feeble minded * * *. His criminal responsibility is not affected * * *. There was nothing in the history to indicate any symptoms of nervous or mental disease." Court-appointed counsel for the defendant filed a motion asking to be allowed a reasonable amount to defray the expenses of an expert on mental diseases to examine the accused. The motion was denied. On appeal, the Supreme Judicial Court held that the denial of the motion was proper, the court saying, 276 Mass. at page 44, 176 N.E. at page 505: "Having been examined by impartial experts the defendant was not entitled as of right to a further examination at the public expense."

The order of the District Court is affirmed.