## UNITED STATES

v.

**Sylvia E. DAVIS, 422 82 7402, Interior Communications Electrician Fireman (E–3), U.S. Navy.**

**NMCM 83 5411.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 3 June 1983.

Decided 27 June 1986.

LCDR Frederick N. Ottie, JAGC, USN, Appellate Defense Counsel.

Lt. Susan R. Cornell, JAGC, USNR, Appellate Defense Counsel.

LCDR John B. Holt, JAGC, USN, Appellate Government Counsel.

Before KERCHEVAL, Senior Judge, and RAPP and GRANT, JJ.

RAPP, Judge:

Contrary to her pleas the appellant was convicted by a special court-martial with members of two brief unauthorized absences, disrespect to a commissioned officer, disobedience of a commissioned officer, disrespect to five different superior petty officers, disobedience of two superior petty officers, assault on two superior petty officers, and threats against three naval personnel. She was sentenced to a bad conduct discharge, 45 days confinement at hard labor, forfeiture of $200.00 pay per month for six months, and reduction to pay grade E-1. The convening authority approved the adjudged sentence without change. The case was first submitted to this Court with a single assigned error alleging that the adjudged bad conduct discharge was inappropriately severe. Subsequently the appellant moved for (1) attachment of a health record entry pertaining to her mental condition after completing her adjudged confinement, and (2) accomplishment of a new paragraph 121, *Manual for Courts-Martial, United States, 1969 (Rev.)* (MCM, 1969) inquiry—"sanity board"; we granted both motions. After some delay the sanity board was completed and the

results were filed with us. Based on the sanity board report and the report of further psychiatric evaluation newly filed in this Court, the appellant submitted three additional assignments of error:

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE DENIED THE DEFENSE MOTION FOR APPELLANT TO BE EXAMINED BY A CIVILIAN PSYCHIATRIST.

THE APPELLANT WAS INCOMPETENT TO STAND TRIAL.

THE APPELLANT WAS INCOMPETENT AT THE TIME OF THE OFFENSES.

By our decision of 14 December 1984[1] we disapproved the adjudged bad conduct discharge, but rejected the other assignments of error and otherwise affirmed the findings and sentence. By order of 11 July 1985 the Court of Military Appeals set aside our decision and returned the case to us for consideration of a specific issue:

WHETHER THE PSYCHIATRIC PROCEDURES EMPLOYED IN THIS CASE SATISFY THE REQUIREMENTS OF *AKE V. OKLAHOMA*, 470 U.S. 68, 105 S.Ct. 1087 [84 L.Ed.2d 53] (1985).

In *Ake*, Justice Marshall specified the issue as:

[W]hether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question.

*Ake*, 470 U.S. at 70, 105 S.Ct. at 1090, 84 L.Ed.2d at 58. Justice Marshall noted that a defendant must have a "fair opportunity to present his defense" and that this is an "elementary principle grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness." *Id.*, 105 S.Ct. at 1093, 84 L.Ed.2d at 61. A criminal trial is fundamentally unfair, he opined, if the state does not make certain that a defendant "has access to the raw materials integral to the building of an

effective defense" or the "basic tools of an adequate defense." 105 S.Ct. at 1094, 84 L.Ed.2d at 62. Turning to the area of psychiatric aid, Justice Marshall pointed out that, "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." 105 S.Ct. at 1095, 84 L.Ed.2d at 64. This is because psychiatrists assist lay jurors, who generally lack training in psychiatric matters, by investigation, interpretation, and testimony. *Id.* Due to the inexact nature of psychiatry and disagreements among psychiatrists, jurors are faced with issues that are complex and foreign, so that the testimony of psychiatrists can be crucial and virtually necessary if an insanity plea is to have any chance of success. In particular,

without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high.

*Id.*, 470 U.S. at 82, 105 S.Ct. at 1096, 84 L.Ed.2d at 65. Justice Marshall commented, however, that a defendant's mental condition is not at issue in every criminal proceeding, but rather the "risk of error from denial of such assistance, as well as its probable value, are most predictably at their height when the defendant's mental condition is seriously in question," so the defendant would have to make a "threshold showing ... that his sanity is likely to be a significant factor in his defense." 105 S.Ct. at 1097, 84 L.Ed.2d at 66. The Supreme Court therefore held that

when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, as-

---

1. *United States v. Davis*, No. 83 5411 (NMCMR 14 December 1984).

sure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* The Court qualified its holding, however, by pointing out that the defendant did not have a constitutional right "to choose a psychiatrist of his own liking or to receive funds to hire his own," and that the decision would be left to the states on how to implement this right. *Id.*

■ At trial the issue of the appellant's mental condition was raised in several contexts: in the military judge's decision to order a sanity board and in the results thereof, by motions asserting lack of mental capacity at the time of trial and requesting funds to retain a civilian psychiatrist of her choice, through government and defense evidence on the merits regarding the defenses of lack of mental responsibility and partial mental responsibility, at the sentencing stage, in arguments by counsel and in the military judge's instructions on findings and sentence. Accordingly, we find that the appellant's sanity was a "significant factor" at her trial, triggering the Government's responsibility pursuant to *Ake v. Oklahoma.*

■ At the time of the appellant's offenses and trial, several provisions of the MCM, 1969 dealt directly with an accused's mental responsibility, capacity, impairment, or deficiency. *See* MCM, 1969, paragraphs 120–124. Additionally, paragraph 116, MCM, 1969 provided for the employment of expert witnesses, including a psychiatrist, on behalf of an accused. Paragraph 121, MCM, 1969, provided for a "board of one or more physicians," including at least one psychiatrist, which would conduct an examination of an accused to determine his or her sanity. This board was broadly empowered to "place the accused under observation, examine him, and conduct any further investigation that it deems necessary." Provisions were made for the confidentiality of the board's report. The inquiry described in paragraph 121 could be ordered before an accused's case was referred to trial, in the course of the trial itself, or even during the various stages of post-trial review. *See also* MCM, 1969, paragraph 124. The paragraph 121 inquiry was triggered by a minimum threshold showing: any commanding officer, investigating officer, trial counsel, defense counsel, military judge or member of the court could recommend such inquiry upon the mere "reason to believe that accused is insane ... or was insane at the time of the alleged offense," and, if the information presented to the officer authorized to order a paragraph 121 inquiry indicated a "reasonable basis" for such inquiry, one "shall" be ordered. Furthermore, Military Rule of Evidence 706(a) specifically extended the equal access provision of Article 46, Uniform Code of Military Justice (UCMJ), 10 U.S.C.A. § 846 to expert witnesses. Paragraph 116, MCM, 1969, authorized the payment of expert witness fees in excess of normal witness fees, thus providing a route for an accused to seek reasonable funding for a psychiatrist of the accused's own choice. The requirements of paragraph 115, MCM, 1969, applied to such requests; i.e., compliance with certain procedural steps and a showing that the witness's testimony was material and necessary. As with other Codal and Manual rights, indigency of an accused was not a consideration. *See United States v. Sweeney*, 14 U.S.C.M.A. 599, 34 C.M.R. 379 (1964).

Comparing the provisions for a military accused's access to psychiatric assistance and evaluation with the Constitutional requirements described by Justice Marshall, we conclude that the military system passes muster. The minimum required to trigger a paragraph 121 inquiry for an accused was well within the "threshold showing" that an accused's "sanity is likely to be a significant factor in his defense" which Justice Marshall has said will activate a state's obligation. The paragraph 121 inquiry board was a neutral body not under the control of the convening authority or law enforcement officials, but rather was composed of medical personnel, conducted its proceedings at a medical facility, fol-

lowed medical procedures, and provided medical opinions. The requirement for multiple members and the broad powers contributed to a comprehensive, objective inquiry. We do not interpret Justice Marshall's exhortation to "assure the defendant access" to a psychiatrist as requiring that the Government (1) appoint a psychiatrist especially for the appellant or (2) guarantee her a psychiatrist who agrees with her position, in the context of his caveats that a defendant has no right to a psychiatrist of his "personal liking" or to funds for hiring "his own" psychiatrist. Instead, we are persuaded that Justice Marshall's goal was the availability of impartial psychiatric advice to the defense as a safeguard against (1) "stacking the deck" against an indigent defendant by a psychiatrist in league with the prosecution [2] or (2) denying an indigent the means to produce enough evidence of a sanity defense to shift the burden of disproving it to the Government.[3] In the military context, however, the first situation was forestalled by the neutral character of the paragraph 121 inquiry board, as we discussed in detail above, and the second is inapplicable in military law, where the accused's sanity could be put into issue merely by "some evidence which could reasonably tend to show that the accused is insane ... or was insane at the time of his alleged offense." MCM, 1969, paragraph 122. This evidence could be credible lay testimony as well as expert opinion. Furthermore, the accused could even obtain funds for his or her own psychiatrist by utilizing the readily-available provisions of paragraph 116, MCM, 1969. Accordingly, we find that the totality of the available military procedures satisfied the appellant's right to psychiatric aid as speci-

fied in *Ake v. Oklahoma.* *See United States v. Mustafa,* 22 M.J. 165 (C.M.A. 1986).

■ Having determined that military procedures satisfied requirements of *Ake v. Oklahoma,* we must evaluate the application of those procedures to this appellant. We need to consider only those matters known to the military judge at the time of the defense motion for government funds to hire a psychiatrist. At that time the military judge had read the charges and specifications before him and had noted "verbal responses and verbal behavior" of the appellant which he described as "apparently or potentially inappropriate, such as smiling, laughing silently or crying." He had also heard the testimony of the appellant's original trial defense counsel regarding unusual behavior of the appellant which counsel observed and difficulties counsel experienced in communicating with her to prepare a defense. The military judge had observed the appellant's demeanor and comprehension of the proceedings during several hours of trial on different days, including discussion of her rights to counsel and her desires as to pleas and type of forum. Additionally, the military judge had the benefit of the testimony of Doctor (LCDR) M, the psychiatrist member of the appellant's paragraph 121 inquiry board. That inquiry, Doctor M testified, consumed as much as eight hours over a period of two months and included an intensive personal interview with the appellant, an extensive personal history questionnaire, the Minnesota Multiphasic Personality Inventory consisting of 500–600 questions, other tests designed to determine the internal factors of an individual's

---

2. *See Ake,* 105 S.Ct. at 1098, 84 L.Ed.2d at 67, where Justice Marshall illustrates the need for impartial psychiatrists by referring to two earlier cases: in *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), "*neutral* psychiatrists in fact had examined the defendant as to his sanity and had testified on that subject at trial" (emphasis added); in *McGarty v. O'Brien,* 188 F.2d 151 (1st Cir.1951), "the defendant had been examined by two psychiatrists who were *not beholden to the prosecution.*" (Emphasis added.)

3. Although psychiatrists testified in other matters at Ake's trial, there was no testimony for either side on his sanity at the time of the offenses; yet he had the burden under Oklahoma law of presenting evidence sufficient to raise a reasonable doubt about his sanity at the time of the offenses, and only then did the burden shift to the Government to prove his sanity.

personality (sentence completion test, house-tree-person test), and conversations with the appellant's supervisors and other knowledgeable sources. On the basis of these methods and tests, which are commonly used in this type of situation and are considered dependable, LCDR M and the other member of the inquiry board determined that the appellant had a "Borderline Personality Disorder," which he defined and explained in detail:

[I]t falls within that category of disturbances called the personality disorders, meaning an inherent, long-standing pattern usually involving maladapted behavior or attitudes. These are usually seen from an early age and they usually result from difficulties with the home environment. In other words, a fairly long history of difficulties that this person's had. Now, specifically the Borderline Personality Disorder is characterized by instability in a number of areas. Their behavior tends to be impulsive, irratic, [sic] sometimes unpredictable and self-damaging. Their mood tends to be unstable, they tend to have marked shifts from euphoria to depression, there is very frequently seen intense anger including displays of anger, and sometimes unpredictable and impulsive displays. Their interpersonal relationships are generally unstable in the sense of being either shallow and superficial or overly clingy and dependent. Frequently, there is a lot of turmoil in their interpersonal relationships, marked shifts of attitude, one day they are deeply in love, the next day they want no more to do with the person. So, instability in a wide variety of areas, I think would be kind of the bottom line as far as characterizing the Borderline Personality organization.

Doctor M pointed out that a person, like appellant, suffering from this disorder would be able to understand the nature of the proceedings against her and to cooperate in her defense. Also, he commented that the appellant was a "highly intelligent individual" who "knows very much what's going on around her, but at times seems not to choose to conform her behavior to what is either asked of her or appropriate in the context," and that her occasional inappropriate or unusual behavior was consistent with such a personality disorder, because it is "inherent in the disorder that there is going to be pervasive hostility, mistrust, defiance of authority ... but ... these things are within the capacity of the individual to control." Doctor M opined that the appellant's condition would not have significantly changed between his last contact with her and the time of trial, that a person with a borderline personality disorder does not turn into a schizophrenic, and that she did not exhibit the characteristics of a psychotic (delusions, hallucinations, nonvolitional actions), but that she could "look crazy" to an untrained observer when she was in reality consciously being deceptive. He described her attitude in meetings with him as generally "very appropriate" but that "when confronted with stress or with a refusal to comply with a request that she might make, then there would be subsequent defiance or displays of temper or accusations." In support of the defense motion the appellant's individual military counsel submitted nothing specific but generally argued that Doctor M had misdiagnosed the appellant, that her condition had changed since the last time Doctor M observed her, and that her actions in court were not known to Doctor M and contradicted his diagnosis.

█ The appellant has not pointed out, and we have not independently identified, any infirmity in the paragraph 121 inquiry board proceedings in this case. Instead, the board was promptly ordered by the military judge and comprehensively examined the appellant. She is not entitled to a diagnosis of her choice but rather a fair and impartial evaluation of her mental condition, and she got exactly that. Furthermore, having evaluated all the evidence which the military judge had before him, we conclude that he did not abuse his discretion in rejecting the appellant's paragraph 116 motion. The appellant had the burden of establishing the materiality and necessity of the requested expert's testimo-

ny by some specific showing. *See United States v. Salisbury,* 7 M.J. 425 (C.M.A. 1979); *United States v. Tangpuz,* 5 M.J. 426 (C.M.A.1978); *United States v. Johnson,* 22 U.S.C.M.A. 424, 47 C.M.R. 402 (1973). She has not done so, instead providing only unsubstantiated hypothesis. These "undeveloped assertions that the requested assistance would be beneficial" are not enough. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). An offer of proof could have been made demonstrating expected expert testimony or textual excerpts could have been provided. *See United States v. Johnson,* 47 C.M.R. at 406. Considering the extensive observation, testing, and evaluation of the appellant, misdiagnosis of the appellant by the paragraph 121 inquiry board is highly unlikely, and Doctor M in his testimony unequivocally demonstrated the lack of validity in the appellant's proposition that her condition had changed between the inquiry board and trial. In the absence of any factual support for the defense request we are left with only speculation, and we are simply unpersuaded that the motion was anything more than an attempt to "shop around" for a psychiatrist who might favor the defense. Thus, we reject the appellant's claim.

We find that the proceedings in this case satisfied constitutional requirements, and we accordingly affirm the findings and sentence as approved on review below, except for the adjudged bad conduct discharge which we have already set aside.

Senior Judge KERCHEVAL and Judge GRANT concur.

UNITED STATES

v.