**UNITED STATES ex rel. SMITH v. BALDI.**

No. 10433.

United States Court of Appeals
Third Circuit.

Argued April 20, 1951.

Decided Oct. 26, 1951.

Biggs, Chief Judge, and McLaughlin and Staley, Circuit Judges, dissented.

542

Thomas D. McBride, Philadelphia, Pa. (Herbert S. Levin, Michael von Moschzisker, Philadelphia, Pa., on the brief), for appellant.

Randolph C. Ryder, Deputy Atty. Gen. of Pennsylvania (Colbert C. McClain, Asst. Dist. Atty., James W. Tracey, Jr., First Asst. Dist. Atty., Philadelphia, Pa., Robert E. Woodside, Atty. Gen. on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This appeal is from a judgment of the United States District Court for the Eastern District of Pennsylvania, sitting en banc, dismissing a petition for habeas corpus filed on behalf of Smith, the relator. Smith's case has had a long history. It was considered by three judges of the Court of Oyer and Terminer of Philadelphia County. It has been twice to the Supreme Court of Pennsylvania, once to the Supreme Court of the United States, twice to the District Court for the Eastern District of Pennsylvania and twice to this Court. The history is fully written in opinions which have come down during the course of the various proceedings concerning Smith.[1] We shall, therefore, state,

---

1. *Conviction* — Commonwealth v. Smith, Philadelphia, Oyer and Terminer, opinion filed March 4, 1949 (unreported), affirmed 362 Pa. 222, 66 A.2d 764 (1949). *Habeas Corpus*—United States ex rel. Smith v. Warden, D.C.E.D.Pa.1949, 87 F. Supp. 339 (dismissed for lack of jurisdiction), affirmed 3 Cir., 1950, 181 F.2d 847; Commonwealth ex rel. Smith v. Ashe, 1950, 364 Pa. 93, 71 A.2d 107, certiorari denied 1950, 340 U.S. 812, 71 S. Ct. 40, 95 L.Ed. 597; United States ex rel Smith v. Baldi, D.C.E.D.Pa.1951, 96 F.Supp. 100.

from point to point, only such facts as are necessary to bring out the questions involved.

The case starts with a killing. Smith while a passenger in a taxi cab drew a gun and killed the taxi driver. He was almost immediately apprehended. He has been adjudged guilty of murder in the first degree and sentenced to death. The killing of the taxi driver by Smith is not denied. This is not a case where a man has been forced into a confession. Nor is it a case where a friendless man has been overreached because he did not have legal counsel. The long record shows that Smith's claimed rights have been vigorously and intelligently asserted. The questions turn upon events in the course of Smith's trial which will be stated as the points arising out of them are taken up.

### Federal and State Jurisdiction

First be it noted that Smith was not prosecuted by the United States; he was accused, tried and convicted in the Pennsylvania courts. Citations of federal decisions like Frame v. Hudspeth, 10 Cir., 1939, 109 F.2d 356, are of no value to us unless they raise the same constitutional law points present when habeas corpus is sought for a state prisoner. Smith's case went once to the Supreme Court of Pennsylvania on the question of a sentence imposed by the Court of Oyer and Terminer. It was again before the Supreme Court of Pennsylvania in habeas corpus proceedings. The basis for the prayer for the writ was the same as that now before the federal courts. The Supreme Court of Pennsylvania denied the writ and certiorari was denied by the Supreme Court of the United States.

So every question before us has been decided adversely to Smith's contentions and the Supreme Court has refused review through certiorari. What is the significance of such refusal? It is urged upon us by the respondent that it is highly significant. He argues that if Smith's petition for certiorari had shown a deprivation of constitutional rights his case would have

been reviewed. That certiorari was refused shows, it is argued, that no such deprivation was even alleged. There was, it is pointed out, no such direction by the Supreme Court as there was in Burke v. State of Georgia, 1950, 338 U.S. 941, 70 S. Ct. 422, 94 L.Ed. 580, allowing petitioner to proceed in the federal district court without prejudice from the denial of his petition for certiorari.

The last word on the subject by the Supreme Court is Darr v. Burford, 1950, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761.[2] The proposition decided in that case does not immediately concern us here. If application for certiorari must in every case be made to review the final state court action before resort may be had to habeas corpus in a federal court, that condition has been fulfilled. Our narrower question is: What effect in the lower federal courts is to be given to the denial of certiorari by the Supreme Court? The Court, through Mr. Justice Reed, says, 339 U.S. at 217, 70 S.Ct. at page 597, 94 L.Ed. 761: "It is this Court's conviction that orderly federal procedure under our dual system of government demands that the state's highest courts should ordinarily be subject to reversal only by this Court and that a state's system for the administration of justice should be condemned as constitutionally inadequate only by this Court."

The doubt-creating word is "ordinarily." When should a district court and a court of appeals again examine merits? Our inclination would naturally be to say "never." It is highly uncomfortable for those of us in courts not of last resort to sit in what is, in effect, review of the highest court of a state. The responsibility is one from which we should be glad to be relieved. But Darr v. Burford does not say that denial of certiorari relieves us. The dissenting opinion in that case points out that no directions are given the lower federal courts on the point. It would be unseemly for us to make argument either way on the questions upon which our superiors

2. Gusik v. Schilder, 1950, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146, involved a court-martial conviction. Cf. also Dowd v. United States ex rel. Cook, 1951, 340 U. S. 206, 71 S.Ct. 262, 95 L.Ed. 215.

differ.[3] We think that what we clearly must do, until we are told to the contrary, is to follow the well established rule that a denial of certiorari does not prove anything except that certiorari was denied. When the applicant for habeas corpus has petitioned for certiorari he has fulfilled a procedural requirement. If he gets certiorari his constitutional questions will be adjudicated on the merits by the Supreme Court. If he does not, he may apply to the appropriate lower federal court for a writ. This seems to be the rule compelled, if not decided, by Darr v. Burford and considerations expressed therein.[4]

But it is to be reiterated that we are not an appellate court for the correction of errors under state law. Each point raised by the relator is to be tested by whether it alleges a violation of rights under the United States Constitution: nothing more. That these allegations have been decided on the merits by the highest state court is a fact to be given great weight by a district court in passing upon petitions for habeas corpus. But that fact does not relieve the federal court of the duty to pass upon the merits of the petition.

The District Court exercised its "discretion" to decline to pass upon the merits. We do not think it had such discretion, and proceed to consider whether, if factually true, the petition sets forth a violation of the federal Constitution.

## Does Relator's Petition Allege Violation of Due Process?

Smith's points have to do with (1) whether his mental state was such that he could be tried; (2) whether his mental state at the time of the shooting was such that he could be convicted of murder.

Has a man a constitutional right not to be tried or executed if "insane" or not to meet the penalty for a crime committed while in that condition? Is the imposition of criminal responsibility in such case, in the words of Mr. Justice Black, so "offensive to the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" that it violates substantive due process?[5] We do not know. It may be no violation of the federal Constitution for a state to provide by law that insanity at the time of commission of a crime no longer bars conviction, sentence or execution. The same may be true as to mental incompetence at the time of trial, sentence or execution.[6] We are not called upon to decide these questions.

The reason we are not called upon to decide them is that Pennsylvania does not disregard the mental condition of a defendant accused of crime. According to its substantive law a man has the right not to stand trial or pay the penalty for an act if his mental condition is not such as to fulfill the legal test of "sanity."[7] And it recognizes the familiar rule that insanity at the time of the offense requires acquittal.[8] Smith is entitled to have procedural due process observed in the protection of these substantive rights even though substantive due process would not compel the rights to be given. Insanity being a defense under Pennsylvania law, due process guarantees all defendants fair opportunity to present the defense. So we must examine the contentions on which Smith relies for his charge that Pennsylvania subjected him to treatment which was not due process of law.

3. Compare the majority, concurring and dissenting opinions in Darr v. Burford, supra.

4. The two concurring Justices and three dissenting Justices in Darr v. Burford agreed that denial of certiorari means nothing on the merits. Dictum joined in by a majority of the Supreme Court is the best available authority. We see no advantage, therefore, in citation and discussion of the great number of cases on the point. However, cf. United States ex rel. Auld v. Warden, 3 Cir., 1951, 187 F.

2d 615; McGarty v. O'Brien, 1 Cir., 1951, 188 F.2d 151.

5. See Phyle v. Duffy, 1948, 334 U.S. 431, 439, 68 S.Ct. 1131, 1134, 92 L.Ed. 1494.

6. See Solesbee v. Balkcom, 1950, 339 U.S. 9, 70 S.Ct. 457, 94 L.Ed. 604.

7. Commonwealth v. Ragone, 1935, 317 Pa. 113, 176 A. 454.

8. 19 Purdon's Pa.Stat.Ann. § 1351; Commonwealth ex rel. Smith v. Ashe, supra note 1.

The first is that he was "overreached" when he was arraigned. Prior to arraignment Smith had been confined in jail. The day before arraignment his relatives had procured private counsel for him. That counsel had not yet had opportunity to enter his appearance and knew nothing of the time set for Smith's arraignment. So when the prisoner stood up to plead he was alone. and the court suggested that Joseph Alessandroni, Esq., a member of the Philadelphia Bar in good standing who was in the courtroom at the time, stand with him. Mr. Alessandroni did not know Smith and had but a moment's consultation with him. Smith, on Mr. Alessandroni's advice, pleaded not guilty.

Did this arraignment constitute lack of due process? It is a little hard to see how entering a plea of not guilty can deprive a man of any rights. In the cases holding that the Fourteenth Amendment required effective assistance of counsel at arraignment a plea of guilty had been entered.[9] The possibility of prejudice in such cases is obvious. But it is argued here that because counsel was not, and had no opportunity to be, informed of Smith's previous mental history he could not at the time of arraignment ask for a special trial to test his sanity then and there, as provided by Pennsylvania law.[10] Lack of effective assistance of counsel resulted in the loss of this valuable right, says relator, and such loss is lack of due process of law.

The argument exaggerates the importance of rights under the statute relied on. Whether a hearing on mental condition in limine will be granted rests in the sound discretion of the judge under Pennsylvania law. The discretion is reviewable, but is so broad that the judge may refuse even to hear evidence on the point. Webber v. Commonwealth, 1888, 119 Pa. 223, 13 A. 427. The most Smith lost, therefore, was the chance to have the judge before whom he was arraigned exercise this broad discretion whether to grant a trial in limine on the question of sanity at the time.

We conclude that the loss of such an opportunity was not so prejudicial to defendant as to amount to violation of due process. Due process does not go so far as to require a hearing on mental condition in any particular manner or at any particular stage in the proceedings. Certainly it does not require a hearing in limine on the question as counsel for relator contend. The most that it requires, in our view, is an opportunity to have adequate hearing on the question before guilt is finally determined. Under Pennsylvania law defendant still had the right to submit the question of his mental capacity to stand trial to the jury which would try the indictment.[11] Pennsylvania provides also a means for special inquiry into an accused's mental condition both while defendant is in custody awaiting trial[12] and upon his appearance in

9. See, e.g. De Meerleer v. People of State of Michigan, 1947, 329 U.S. 663, 67 S.Ct. 596, 91 L.Ed. 584; Carter v. People of State of Illinois, 1946, 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172; Williams v. Kaiser, 1945, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398. Cf. Council v. Clemmer, 1949, 85 U.S.App.D.C. 74, 177 F.2d 22, certiorari denied 1949, 338 U.S. 880, 70 S.Ct. 150, 94 L.Ed. 540.

10. "The same [commitment] proceedings may be had, if any person indicted for an offense shall, upon arraignment, be found to be a lunatic, by a jury lawfully impanelled for the purpose * * *." Act of March 31, 1860, P.L. 427, § 67, 19 Purdon's Pa.Stat.Ann. § 1352.

11. Webber v. Commonwealth, supra; 19 Purdon's Pa.Stat.Ann. § 1352.

12. The Mental Health Act of 1923, as amended May 28, 1937, P.L. 973, § 1, 50 Purdon's Pa.Stat.Ann. § 48 provides in pertinent part: "When any person detained in any prison * * * whether awaiting trial or undergoing sentence, or detained for any other reason * * * shall, in the opinion of the superintendent, jail physician, warden [etc.] * * * be insane, or in such condition as to make it necessary that he be cared for in a hospital for mental diseases, the said superintendent * * * shall immediately make application * * * to a law judge * * * for commitment of said person to a proper hospital for mental diseases. The said judge shall forthwith order an inquiry by two qualified physicians, or by a commission * * * [of two doctors and a lawyer, who shall

court.[13] The question of defendant's mental ability to stand trial remained open and could have been raised in several different ways after arraignment. We conclude, therefore, that even if Pennsylvania did not provide defendant with "effective assistance of counsel" at his arraignment, he suffered no deprivation of federal constitutional right because of it.

Following Smith's arraignment his trial was postponed several times at the request of his lawyer. The latter wanted to get from New York material relative to Smith's hospitalization in a mental institution there. Upon the statement of Smith's privately retained counsel that no money was available to procure such information, the court appointed him and another attorney as state-appointed counsel for Smith. This made it possible to subpoena the records and witnesses from New York, a matter which took some time. In the meantime, after consultation among the assistant district attorney in charge of the case, defendant's lawyers and, in part at least, the trial judge, the plea of not guilty was withdrawn and the plea of guilty entered. A hearing was had September 21, 1948, in which the Commonwealth's evidence was introduced, it being agreed that further hearings would be had at which defendant could produce his evidence.

On October 28, 1948, a second hearing was had at which defendant introduced records from the New York hospital and testimony of several doctors who had examined Smith there, as well as records from the Philadelphia General Hospital. This evidence revealed that in 1945 Smith had been committed to an institution in New York by order of a New York court subsequent to a mental examination and report. At this institution his condition was diagnosed as dementia praecox, and he remained there for four months before being discharged as recovered. It also appeared that at one time Smith had voluntarily committed himself to the Philadelphia General Hospital because he was afraid he was going to kill someone, but was released after ten days.

After the hearing of October 28 the court appointed a psychiatrist, Dr. William Drayton, Jr.[14] to examine Smith. Dr. Drayton did so and at a hearing on November 5, 1948, reported his findings and was subjected to questioning by the district attorney, the court and by Smith's lawyers. Dr. Drayton's expressed view was that the prisoner was perfectly sane both at the time of the killing and at the time he examined him, and was "faking" for the purpose of avoiding trial. The trial court concluded that Smith was sane both at the time of trial and at the time he killed the taxi driver and entered a judgment of guilty in the first degree and fixed the penalty at execution by electrocution.

On behalf of Smith it is said that it is lack of due process of law to fail to provide a psychiatrist at public expense to assist defense lawyers in a case which involves a question of an indigent prisoner's sanity. The prosecution may have such psychiatric

report their findings to the judge]. The said judge may, in his discretion, summon other witnesses and secure further evidence. If he is then satisfied that the person * * * is in fact insane, he shall order the transfer of such person to a hospital for mental diseases. * * * * "

Relator's counsel applied to the court for the appointment of such a Commismission but it was denied because only the warden may make such application. See Commonwealth v. Barnes, 1924, 280 Pa. 351, 124 A. 636. The warden refused to apply for it. Such refusal is reviewable by mandamus. See Commonwealth ex rel. Smith v. Ashe, 1950, 364 Pa. 93, 116, 71 A,2d 107, 119, certiorari denied 1950, 340 U.S. 812, 71 S.Ct. 40, 95 L. Ed. 597.

13. 50 Purdon's Pa.Stat.Ann. § 48, supra, continues: "When, on the production or appearance of any person charged with criminal offense, * * * it shall appear to the court that such person is insane, or in such condition as to make it necessary that he be observed or cared for in a hospital for mental diseases, proceedings for the commitment of such person to such a hospital shall be had * * * upon application of some person to be designated by the court." This provision appears to have been disregarded or overlooked by counsel.

14. Chief of the Philadelphia General Hospital psychiatric department since 1926; neuropsychiatrist in the Philadelphia Municipal Court since 1922; associate professor neuropsychiatry in the Graduate School of Medicine of the University of Pennsylvania.

consultation, it is said, "to prove the relator is sane." Fundamental fairness, the argument runs, requires the same privilege to be given to the defendant at public expense if he cannot pay for it himself. There is nothing in the record to indicate that a request for such help was ever made. Assume however that it was, as relator claims.

There is a fallacy, we believe, in the assumption that the psychiatrist was called upon by the court to prove Smith sane. He was called upon by the court at the suggestion of Smith's lawyers, to give the court the benefit of his professional opinion, and he did. After he made his report in open court he was fully cross-examined. The doctor was not a "prosecution" witness; he was the court's witness. This important consideration was pointed out by the First Circuit recently in a case practically on all fours with this issue of the case at bar. In that case, McGarty v. O'Brien, 1 Cir., 1951, 188 F.2d 151, 155, the court said: "The doctors designated by the Department of Mental Health to make the examination are not partisans of the prosecution, though their fee is paid by the state, any more than is assigned counsel for the defense beholden to the prosecution merely because he is, as here, compensated by the state. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of accused."

Furthermore, we have great difficulty in accepting as a proposition of constitutional law that one accused of crime is entitled to receive at public expense all the collateral assistance needed to make his defense. Here Smith was, at public expense, given two thoroughly competent lawyers. The same argument that would entitle them to psychiatric consultation would entitle them to consultation with ballistic experts, chemists, engineers, biologists, or any type of expert whose help in a particular case might be relevant. We do not think the requirements of due process go so far. In any event, Smith had here the benefit of the past medical history and whatever further examination his lawyers

cared to make of Dr. Drayton in open court. Whether the Doctor's opinion was accurate scientifically, whether it was reached after sufficient examination, these and other questions going to the weight of the evidence are surely not before us in a habeas corpus proceeding.

Our conclusion on this issue is in accord with that reached recently by the First Circuit in McGarty v. O'Brien, quoted from above. In that case the indigent defendant's mental condition in a capital case had been put in issue. He was examined by two psychiatrists acting in behalf of the Massachusetts Department of Mental Health pursuant to a statute. The psychiatrists reported that defendant had a psychopathic personality but was "not suffering from any mental disease or defect which would affect his criminal responsibility." Defendant's counsel then requested that he be allowed to employ two psychiatrists at the expense of the Commonwealth to aid in the defense. The request was denied. The Court of Appeals affirmed the District Court decision on habeas corpus that this did not constitute denial of due process. It said " * * * examination and report by two competent and impartial experts supplied at state expense is enough, we think, to satisfy the state's constitutional obligation under the due process clause." McGarty v. O'Brien, supra, 188 F.2d at 157.

We agree. The only difference between what Massachusetts did in the McGarty case and what Pennsylvania has done here is that in Massachusetts two psychiatrists examined defendant instead of one and they were appointed by an independent agency rather than by the court. Such a difference does not amount to the granting of due process in one and its denial in the other.

In connection with the adjourned hearings mentioned above, there is one point made by the relator which has caused us serious concern. It is said that a court of three judges convened to hear the testimony after a plea of guilty, made their adjudication of first degree murder before they heard Smith's evidence and that any evidence heard thereafter was considered only in mitigation in determining

whether the penalty should be life imprisonment or death. There are some docket entries, endorsements on the indictment, of which we have been furnished a facsimile, and remarks by the Supreme Court of Pennsylvania [15] indicating that as a matter of dates somebody, at least, thought this was so. From this comes the argument that the prisoner's guilt of first degree murder was settled by the judges before his evidence was ever presented, and that he never had opportunity to have the question of his sanity, for purposes of guilt or ability to stand trial, considered.

The argument has been carefully considered with the conclusion that it is invalid. If the testimony produced on behalf of the prisoner had been such as to create doubt of his guilt he could have moved to withdraw the plea of guilty and enter a plea of not guilty.[16] Action on such a motion would have been reviewable in Pennsylvania.[17] We understand also that the judge can order the withdrawal of the guilty plea of his own motion and direct that the plea of not guilty be entered. There is no indication that any such motion or suggestion was ever made on behalf of the prisoner. Nevertheless, the question of his guilt or lack of it was open in the trial court until the judgment of guilty was entered and penalty fixed. The latter, at least, was not until February 4, 1949. Whether the docket entries reflect accurately the status of the case or not we see no reason to think that Smith was precluded from having his whole case considered by the three judges who constituted the trial court. It was so considered, as is shown below.

The petition for habeas corpus states that when the guilty plea was entered Smith's counsel, the district attorney and the court agreed that if the New York records "raised an issue or doubt of Relator's sanity, the court would consider withdrawal of the plea of 'Guilty'." During the course of the hearing at which such evidence was heard the following statement was made by one of the judges:

"Judge Carroll: Don't you see what he is doing; he is helping you to prepare your resistance of this when the trial of this case comes, which may not come, when this plea will have to be withdrawn and the defendant will have to be tried." Later on, after the director of the hospital in New York who had authorized Smith's release verified the diagnosis of dementia praecox and stated that at the time of release Smith had recovered from any mental illness which he had, the following colloquy ensued:

"Mr. Levin [counsel for defendant]: Shall I proceed to examine him further in the face of that statement? Does that satisfy any uncertainty which your Honors may have had in regard to the withdrawal of the plea?

"Judge Guerin: It does not to my idea.

"Mr. Levin: I think it raises an issue, sir.

"Judge Sloane: I am certainly of the opinion now he was sane and lucid in October of 1945. * * *"

At the last hearing the psychiatrist, Dr. Drayton, was asked by the court whether in his opinion Smith was sane, knew the difference between right and wrong, knew the nature of his acts at the time of the killing and at the time he was examined. These questions and the excerpts quoted above, together with the agreement under which the guilty plea was accepted, make it clear to us, without need of further evidence, that the questions of guilt and ability to stand trial were still open during the receipt of defendant's evidence relative to mental condition. The principal purpose of the evi-

15. Commonwealth v. Smith, 1949, 362 Pa. 222, 223, 66 A.2d 764.

16. Commonwealth ex rel. Smith v. Ashe, 1950, 364 Pa. 93, 113, 71 A.2d 107, 117; Commonwealth v. Shawell, 1937, 325 Pa. 497, 191 A. 17. Cf. 19 Purdon's Pa. Stat.Ann. § 241. "[A person accused of crime other than homicide may waive indictment by a grand jury and plead guilty or not guilty to a district attorney's indictment.] * * * and provided further, That the defendant may withdraw his plea of guilty, at any time before sentence, by leave of the court."

17. See note 16, supra. Cf. Commonwealth ex rel. O'Niel v. Ashe, 1940, 337 Pa. 230, 10 A.2d 404.

dence may have been to aid the court in determining penalty, but it was obviously considered on the merits of the whole case as well. A reading of the unpublished opinion of the trial court substantiates our conclusion. It discloses that the court determined that Smith was sane both when he killed the cab driver and when he was tried. That being so the only conclusion possible for the court to draw was guilt of first degree murder. The record does not disclose any motion to withdraw the plea of guilty, but if such a request was made, its refusal under these conditions presents nothing for the consideration of a federal court.

■ Argument on behalf of the relator suggests that the Supreme Court of Pennsylvania violated due process by considering evidence which was not before it in disposing of the habeas corpus petition. This evidence consisted of the testimony taken in the first habeas corpus proceeding in the District Court for the Eastern District of Pennsylvania. This proceeding terminated before the habeas corpus proceeding in the Supreme Court of Pennsylvania and the petition was dismissed because the relator at the time was outside the territorial limits of the Eastern District. Relator's argument was that the Supreme Court of Pennsylvania pulled some of this testimony into its consideration gratuitously and it is denied that it was done either with agreement or acquiescence of relator's counsel. But in the very petition to the Supreme Court of Pennsylvania for habeas corpus petitioner refers to this proceeding and gives his version of what the testimony established. We think it can hardly be lack of due process for the Supreme Court to refer to the testimony when the relator himself did so.

A reading of all the exhibits indicates that this prisoner has received careful treatment at the hands of the Pennsylvania courts in the protection of his constitutional rights. His trial was postponed several times in order that his counsel might get the out-of-state records and testimony already referred to. At every step of the way he has had legal counsel. He was examined by an apparently impartial and qualified psychiatrist appointed by the court at the suggestion of his own counsel. The three judges who sat on his case in the first instance joined in an opinion a substantial portion of which was devoted to Smith's mental condition. The Supreme Court of Pennsylvania affirmed the original judgment; it also went through the case at length upon the petition for habeas corpus.

An inquiry was made into relator's sanity; testimony by an apparently qualified and impartial expert was received upon the point and, as pointed out above, cross-examination had. We find nothing which constitutes a lack of due process of law on the basis of anything which appears in the record before us or what the relator charges.

The judgment of the District Court will be affirmed.

BIGGS, Chief Judge, and McLAUGHLIN and STALEY, Circuit Judges (dissenting).

The court below did not grasp the nettle which this case presents nor do we think it is seized by the majority of this court.

According to the petition and the evidence introduced in the court below the relator, Smith, an indigent defendant, now twenty-six years of age, has a history of grave mental illnesses. His record in the United States Army indicates the first recognition of his disorders.[1] Having been found to be a schizophrenic, he was adjudged insane by a New York Court.[2] He also asked to be committed to the Philadelphia Naval Hospital because, according to his own statement, he was afraid he might kill someone, but he was transferred to the Philadephia General Hospital because of lack of facilities.[3] Some time

---

1. See Record on Appeal to the Supreme Court of Pennsylvania, Commonwealth v. Smith, No. 137, January Term, 1949, p. 166a.

2. See the adjudication of Judge Soble in People v. Smith, Indictment No. 441, year 1945, County Court, Kings County, New York. Id., supra, pp. 118a–119a.

3. See id. p. 140a et seq.

thereafter he committed the crime for which he was tried and which he has confessed.

The petition for habeas corpus filed in the court below by Smith incorporates by reference the allegations of a petition for habeas corpus previously filed by him in the Supreme Court of Pennsylvania. Both petitions allege, insofar as is pertinent to this review, that Smith was sentenced to death by the Court of Oyer and Terminer, Philadelphia County, he having been found guilty of murder in the first degree.

Smith alleges that he was insane at the time of the commission of the crime on January 15, 1948, at the time he entered the plea of "Not Guilty", at the time he changed that plea to "Guilty", and that he is still insane.

He avers that an instant or two before his arraignment in the Court of Oyer and Terminer, the Judge presiding in that Court directed a member of the Philadelphia Bar, who had never seen him before, to instruct him as to the formal answers which he was to give, including the plea of "Not Guilty", that he thereupon pleaded "Not Guilty" and that because of this procedure at arraignment he lost his opportunity to have his sanity determined *in limine* pursuant to the Pennsylvania Act of March 31, 1860, P.L. 427, Section 67, 19 P.S.Pa. § 1352.

The relator alleges also that he previously had been adjudged insane by a New York State Court in 1945; that because of his poverty his privately engaged counsel [4] was unable to procure the records relating to his insanity from the Brooklyn State Hospital where he had been confined, that this counsel withdrew because as private counsel he could not obtain these records without money, but that thereafter, the same attorney and another member of the Philadelphia Bar were designated as Smith's attorneys by the Court in order to procure the Brooklyn State Hospital records.

Smith further alleges that it was agreed by his counsel, the Assistant District Attorney and the Court that if the relator would plead guilty generally to the charge of murder the records of his mental illnesses could be procured, and that if such evidence raised an issue or even a doubt of Smith's sanity the Court would consider the withdrawal of the plea of "Guilty". Smith alleges that this agreement was acted upon; that he withdrew his plea of "Not Guilty" and on September 21, 1948, viz., on the same day the plea of guilty was entered, the Court found him guilty of first degree murder without having received the Brooklyn State Hospital and other records in evidence on his behalf.[5]

---

4. This counsel, following the momentary appearance of the attorney who was directed by the Court of Oyer and Terminer to stand up with Smith at his arraignment, was privately engaged by Smith's mother.

5. The petition to the Supreme Court of Pennsylvania in respect to these issues alleges that:

"10. When, therefore, counsel were notified that trial had been fixed for September 21, 1948, they conferred with Honorable Charles L. Guerin, to whom the case had been assigned for trial, and Colbert C. McClain, the Assistant District Attorney in charge. This conference occurred pre-trial, and the foregoing facts were revealed and counsel's and Relator's predicament was made known.

"11. At such conference, counsel for Relator also mentioned their desire to have the trial court allow a petition to subpoena the records of the Brooklyn

State Hospital, since they were material to the issue of Relator's sanity.

"12. To preclude further delay, and it being agreed by the conferees that under Pennsylvania law, court-appointed counsel could not be provided with psychiatric examination and advice, it was further agreed between counsel, the District Attorney and the court that the plea be changed to 'Guilty', that the Commonwealth present its testimony on September 21st before a court en banc, that the case be then postponed sufficiently to allow counsel to subpoena the New York records, and that if these records, when introduced in evidence, raised an issue or doubt of Relator's sanity, the Court would consider withdrawal of the plea of 'Guilty'.

"13. Thereupon, Relator's plea was changed to 'Guilty' on September 21, 1948.

"14. On the same day, September 21, 1948, the court adjudged relator guilty

Smith avers that the Court did not determine his capacity to plead, to participate in the hearings or to co-operate with counsel in his own defense, that the Court failed to supply him with psychiatric assistance and that without such assistance his counsel were unable adequately to represent him.

Smith alleges further that after he had been adjudicated guilty of murder in the first degree the Court of Oyer and Terminer, sitting *en banc*, received the Brooklyn State Hospital records, the records of Smith's voluntary confinement in the Philadelphia General Hospital and the testimony of Dr. William Drayton, Jr., a psychiatrist directed by the Court to examine him. He asserts that the Court thereafter sentenced him to death; that an appeal was taken to the Supreme Court of Pennsylvania which affirmed the judgments of conviction and sentence [6] and that thereafter a petition for habeas corpus was filed with the Supreme Court of Pennsylvania in which reference was made to testimony received in an earlier habeas corpus proceeding filed in the United States District Court for the Eastern District of Pennsylvania.[7] The petition filed with the Supreme Court of Pennsylvania [8] was denied and certiorari was denied by the Supreme Court of the United States.[9]

Smith asserts that by reason of the foregoing he was denied due process of law as guaranteed to him by the Fourteenth Amendment.

The petition filed with the court below does not expressly allege that Smith was denied due process of law by the Supreme Court of Pennsylvania because of its refusal to grant the writ. A large part of the relator's oral argument and of his briefs in this court was devoted to this proposition, however, and to avoid a technical defect, one which may be cured readily by amendment but which otherwise might result in the defeat of justice, we will treat the petition filed in the court below, as did that tribunal, as containing the necessary supplementary allegations to raise the question of the constitutionality of the action taken by the Supreme Court of Pennsylvania.[10] The court below issued a rule to show cause based on the petition and thereafter, sitting *en banc*, discharged the rule and denied the writ.[11] Three judges dissented. The majority held that a United States district court should not reverse the highest tribunal of a State in a case where the constitutional issues had been disposed of on the merits and where there had been no denial of due process of law by the State to the defendant. With that proposition of law we are, of course, in accord and if the facts at bar made the principle applicable there would be no dissenting opinion here.

The three dissenting judges in the court below took the position that the record disclosed that no testimony was taken in the habeas corpus proceeding before the Su-

of Murder of the first degree without having received in evidence and without having considered the records as to or the question of Relator's sanity, his capacity to plead Not Guilty, change his plea to to Guilty, participate in the hearing, cooperate with counsel, and make his defense.

"15. On October 28, 1948 and November 5, 1948, the court heard further testimony on the issue of penalty only. Although the testimony raised a doubt as to Relator's sanity and mental capacity to plead and stand trial, or participate in the hearing, cooperate with counsel and make his defense, the guilty plea was not permitted to be withdrawn."

6. See Commonwealth v. Smith, 362 Pa. 222, 66 A.2d 764. No application for certiorari was made to the Supreme Court of the United States.

7. See United States v. Warden of Philadelphia County Prison, D.C.E.D.Pa., 87 F.Supp. 339, affirmed 3 Cir., 181 F.2d 847.

8. See Commonwealth v. Ashe, 364 Pa. 93, 71 A.2d 107.

9. See Pennsylvania ex rel. Smith v. Ashe, Warden, et al., 340 U.S. 812, 71 S.Ct. 40, 95 L.Ed. 597.

10. The petitioner asked leave to supplement his petition at a later date. The time for preparation of the petition was short since the petitioner was about to be executed. No supplementary pleadings have been filed, however.

11. See United States v. Baldi, D.C., 96 F. Supp. 100.

preme Court of Pennsylvania and that whether that Court had any facts before it or whether it had actually made any findings of fact was not clear. Characterizing the dismissal of the suit as premature, the dissenting judges concluded correctly that pursuant to the provisions of Section 2243, Title 28 United States Code, the court below should have summarily heard and determined the facts and should have disposed of the matter as law and justice required. The appeal at bar followed. The disposition of the appeal is complicated by the confused state of the record.[12]

The court below was of the view that only issues of law were presented and decided the case on these. It made no findings of fact. Since the court below made no findings of fact and did not select or designate what was true and what was false, we will take those inferences most favorable to the relator from the evidence as supplied by the exhibits admitted before the court below. So regarding the evidence we reach the conclusion that the order of the court below should be reversed.

For the reasons set out immediately hereinafter we conclude that the Commonwealth of Pennsylvania did not afford Smith due process of law as guaranteed to him by the Fourteenth Amendment:

(1) The Supreme Court of Pennsylvania took no testimony. It did receive, in some way not clear from the record, the proceedings which were had in the court below in the earlier habeas corpus proceedings in which testimony had been received on October 4 and 6, 1949. See note 7, supra. That Court first stated that it had received the transcript of these proceedings by agreement of Smith's counsel but when that counsel made vehement objection to this statement and filed an affidavit stating that he had not consented to the receipt of the transcript, the Supreme Court of Pennsylvania changed note 2, cited to its opinion, and stated therein that the record of the earlier habeas corpus proceedings had been received in evidence "With the acquiescence, at bar, of the respective counsel * * *". See the decision cited in note 8, supra, [364 Pa. 93, 71 A.2d 109]. Smith's counsel asserted vigorously in the court below and has asserted here that this statement is incorrect. But in any event it is clear that disputed questions of fact were presented by the petition. If they be resolved in the relator's favor he was insane at the time of the commission of the crime, at the times of his arraignment, hearings, adjudication of guilty of first degree murder, and at the time he was sentenced to death. Insanity at the time of the commission of a crime is a complete defense in Pennsylvania for an insane person cannot be guilty of murder. This is stated categorically by the Supreme Court of Pennsylvania in its decision in Smith's habeas corpus proceeding. Commonwealth v. Ashe, 364 Pa. 93, 106, 71 A.2d 107, 114. Such has long been the law of Pennsylvania. Moreover an insane person cannot be legally tried or sentenced. Commonwealth v. Ragone, 317 Pa. 113, 124–126, 176 A. 454, 459–460. If Smith was insane at the times mentioned or at any of them the Court of Oyer and Terminer did not possess the power to find Smith guilty of first

12. Numerous public documents were received in evidence by the court below as exhibits. These include the opinion of the Court of Oyer and Terminer of Philadelphia County at No. 384 February Term, 1948, in the case of Commonwealth v. Smith, a transcript of the record of the proceedings before that court in the form of the printed record filed on appeal to the Supreme Court of Pennsylvania from the original judgment, the pleadings in the earlier habeas corpus proceeding in the Court below at No. 1334 (of which the court below was entitled to take and of which it did take judicial notice), the pleading in the habeas corpus proceeding in the Supreme Court of Pennsylvania, the petition for certiorari to the Supreme Court of the United States following the denial of a writ of habeas corpus by the Supreme Court of Pennsylvania, and the clemency application to the Pennsylvania Board of Pardons. As to the earlier habeas corpus proceeding in the court below see 87 F. Supp. 339. The judgment dismissing the petition was affirmed by this court on the ground that Smith was outside the geographical limits of the Eastern District of Pennsylvania at the time the writ of habeas corpus was issued. See 181 F. 2d 847.

degree murder or to sentence him to death. The error was not one of law to be corrected on appeal. The Court of Oyer and Terminer either had no power to proceed as it did or had lost that power. The Supreme Court of Pennsylvania in failing to adjudicate this issue denied the relator due process as guaranteed by the Fourteenth Amendment.

(2) As to the designation of counsel for Smith by the Court of Oyer and Terminer at the time of his arraignment, the following is extremely pertinent. A true bill was returned against Smith on February 18, 1948. A week later he was arraigned on this indictment. Shortly before this, probably the night preceding the arraignment, Smith's mother retained counsel to represent him. Neither Smith nor the Judge sitting in the Court of Oyer and Terminer was aware of this fact. When Smith was called to stand up for his arraignment, the Court, seeing that he was without counsel, called on a member of the Philadelphia Bar, who had never seen Smith before and knew nothing about him, to stand up with him and act as counsel. Under the direction of this attorney, as we have said, the relator entered a plea of "Not Guilty".[13] At this point, if the facts are as alleged, Smith lost a valuable right, viz., the right to have his sanity determined *in limine* under the Act of March 31, 1860, P.L. 427, Section 67, 19 P.S.Pa. § 1352.

The majority of this court conclude that this view exaggerates the importance of Smith's right under Section 1352. They point out that whether a hearing on a defendant's mental condition will be granted *in limine* rests in the sound discretion of the trial judge under the Pennsylvania Act of 1860 and that that discretion has been held to be so broad, Webber v. Commonwealth, 119 Pa. 223, 13 A. 427, that the judge may

refuse even to hear evidence on the issue of sanity. It follows, say the majority, that the most the relator lost was the chance to have the trial court exercise its discretion. This seems to us to be a very valuable right. Smith was prejudiced because at his arraignment he was not represented by counsel who could have informed the Court[14] as to his mental condition, counsel who could have asserted Smith's right to cause the Court to exercise its legal discretion. But the statute law of Pennsylvania required Smith, a destitute defendant on trial for murder, to be assigned counsel to represent him. See the Act of March 22, 1907, P.L. 31, Section 1, 19 P.S.Pa. § 784.[15] The necessity for the appointment of counsel for an indigent defendant in a capital case exists at every stage of the proceedings. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; cf. Robinson v. Johnston, D.C.N.D.Cal., 50 F.Supp. 774. An attorney assigned to represent a defendant must either have knowledge of his client's case in advance of arraignment or be given a reasonable opportunity to inform himself of that case if he is to possess the capacity to represent his client. If the attorney does not possess such knowledge the representation is a sham and will not meet the requirements of the Fourteenth Amendment. We conclude that at arraignment Smith was overreached. Townsend v. Burke, 334 U.S. 736, 738–741, 68 S.Ct. 1252, 92 L.Ed. 1690.

The majority opinion of this court holds that Smith could still have submitted the question of his sanity to a jury impanelled to try him on the indictment. The 1860 Act indeed so provides. The procedure of having a defendant's guilt or innocence tried by the same jury which determines his sanity strains the modern concept of due process to the limit if it does not exceed the bounds of the Fourteenth Amendment. The 1860 Act may perhaps be considered as a

---

13. The member of the Philadelphia Bar may not be justly criticized. He acted in good faith at the direction of the Court and as competently as any lawyer could have under the circumstances.

14. There is no suggestion in the record that the judge of the Court of Oyer and Terminer had any greater knowledge of Smith's background than the member

of the Philadelphia Bar who so suddenly was called upon to represent him at his arraignment.

15. Cf. the Act as amended by the Act of April 6, 1949, P.L. 406, Section 1. See Townsend v. Burke, 334 U.S. 736, at page 739, 68 S.Ct. 1252, 92 L.Ed. 1690, and the note cited to the text of Mr. Justice Jackson's opinion.

vestigial remnant of the days when a defendant could not testify in his own defense. But the short answer to the majority's position lies in the fact that due to the agreement, hereinbefore referred to and discussed under point (3) infra, between Smith's attorneys, the Assistant District Attorney and the Court, Smith agreed to plead guilty generally and no jury was ever called upon to sit in his case.

(3) As to the bargain or agreement, referred to immediately above as well as in the seventh paragraph of this opinion, whereby Smith pleaded guilty in order that his court-appointed counsel might procure the hospital records from the Brooklyn State Hospital relating to his illness and his adjudication of insanity, it is necessary to make a somewhat extensive statement of the evidence in the record.

On March 19, 1948 Smith's privately engaged counsel filed a petition under the Pennsylvania Mental Health Act of 1923, as amended May 28, 1937, P.L. 973, Section 1, 50 P.S.Pa. § 48, for the appointment of a commission to inquire into Smith's mental condition. This petition was dismissed on April 2, 1948, the Court of Oyer and Terminer holding that such an inquiry could be ordered only on motion of the superintendent or warden of the jail in which a criminal defendant is held in custody. See note 16, infra, and Commonwealth v. Barnes, 280 Pa. 351, 124 A. 636, and Commonwealth v. Dunn, 47 Pa.Dist. & Co. R. 685. Dr. Baldi, the respondent in the instant suit, Superintendent of the Philadelphia County Prison, refused to apply to the Court to have such an inquiry made.

The allegations of the petition, set out in note 5, supra, present a striking analogy to Commonwealth v. Senauskas, 326 Pa. 69, 70–74, 191 A. 167, 168–169. In that case Mr. Chief Justice Kephart stated: "It may be stated generally that for a judge to make a bargain, engagement, or promise in advance of the hearing of a case, *irrespective of what the evidence might thereafter show the facts to be* and as to what judgment he should render therein, would be judicial misconduct. Such agreements have uniformly been held to have no binding effect, and they are incompatible with the powers or duties of a judicial officer. The failure of a judge, who enters into an agreement of this type, to comply with his promise gives to the defendant the right to withdraw his plea of guilty and enter a plea of not guilty, under the theory that the plea of guilty is not binding upon a defendant when induced by fear, promises, persuasion, or ignorance. Indeed, a confession made under such circumstances would not be received as evidence. In Morgan v. State, 33 Okl.Cr. 277, 243 P. 993, 994, where a plea of guilty was entered in reliance on a promise of leniency, which the judge failed to abide by, the court said: '* * * we think that, under these circumstances, the defendant should have been permitted to withdraw his plea of guilty and substitute therefor a plea of not guilty.'"

If the allegations of the petition be true, the Court of Oyer and Terminer entered into a bargain with Smith whereby he was to plead guilty generally in order that the records of the Brooklyn State Hospital might be procured and introduced in evidence on his behalf.[16] Included in that bargain, ac-

16. The Judge and counsel all were under the impression that no commission could be appointed under the Pennsylvania Mental Health Act of 1923, as amended May 28, 1937, P.L. 973, 50 P.S.Pa. § 48, unless Dr. Frederick S. Baldi, the Superintendent of the prison in which Smith was confined, petitioned the Court for the appointment of a commission. Actually the Court, on its own motion, could have designated some person to petition for the appointment of a commission under the Mental Health Act which, in pertinent part, provides as follows: "When, on the production or appearance of any person charged with criminal offense * * * it shall appear to the court that such person is insane, * * * proceedings for the commitment of such person to such a hospital shall be had, such as are provided for in section three hundred seven or section three hundred three of this act, upon application of some person to be designated by the court." See Commonwealth v. Brown, 65 Pa.Dist. & Co.R. 284, 288.

Moreover, without regard to the statute law of Pennsylvania, it cannot be doubted that the granting of an inquest in lunacy under the common law still

cording to the allegations, was the proposition that if these records raised doubt as to Smith's sanity he should be permitted to withdraw his plea of guilty. See paragraph "12" of the petition as set out in note 5 of this opinion. The fact that the agreement was one suggested, it would appear, by the relator's own counsel and entered into by both Court and counsel with the best of motives, makes no difference. If the allegations are correct, Smith was overreached and should now be permitted to plead not guilty and be put on trial. Acting pursuant to the great weight of authority, most courts before which such questions have come, have set such agreements aside and have permitted pleas of guilty, when entered under the circumstances which pertain here, to be withdrawn.[17] Not to require the withdrawal of Smith's plea of "guilty" and to grant him a jury trial was a denial of due process of law.

Even if no express motion was made by Smith's counsel for the withdrawal of the plea, as seems to have been the case, where, as here, the insanity of the relator was seriously in question, the Court of Oyer and Terminer *sua sponte* should have caused the withdrawal of the plea. The Court lost the power to proceed without such a withdrawal.

The Supreme Court of Pennsylvania did not meet this point. In Commonwealth v. Ashe (the opinion denying Smith habeas corpus), 364 Pa. 93, 105, 71 A.2d 107, 113, it seemed to make the legal assumption that Dr. Baldi's refusal to petition for the appointment of a commission justified the Court of Oyer and Terminer in concluding that Smith was sane. But, admittedly Dr.

Baldi was not a psychiatrist. In the Ashe case, 364 Pa. at p. 106, 71 A.2d at p. 114, the Supreme Court of Pennsylvania stated: "This court, as was the trial court, is confronted with the fact that the experienced counsel for the relator entered a plea of guilty to the indictment charging him with murder. Since no insane person can be guilty of murder, the fact that Smith's counsel freely entered for him a plea of guilty, reasonably gives rise to the inference that his counsel believes Smith sane." If the allegations of the petition be correct Smith's counsel did not *freely* enter a plea of guilty for him as we have shown. But whether or not Smith's counsel believed him to be sane or insane is irrelevant and immaterial. The Supreme Court of Pennsylvania seems to base a most vital conclusion, a conclusion of law which was determinative of the whole case, on the conduct of the relator's counsel and the attitude of the Superintendent of the Philadelphia County Prison.

Such a method of arriving at a conclusion of law had not previously received judicial sanction. The vital and paramount questions at Smith's trial were and had to be whether Smith was sane or insane at the time of the commission of the crime and at the time of his trial. The Supreme Court seems to have substituted two attitudes of mind, that of Smith's counsel and that of Dr. Baldi, for a necessary finding of fact upon an issue clearly raised by the habeas corpus proceeding. Again we do not call attention to mere legal error. The point is jurisdictional for the Court of Oyer and Terminer was without power to try an insane man or to find him guilty of first degree murder.[18]

rests in the sound discretion of the trial judge. See Commonwealth v. Green, 346 Pa. 172, 174, 29 A.2d 491, 492, and Notes 1 and 2 cited to the text in that opinion. But according to counsel for Smith in the court below, Judge Flood of the Court of Oyer and Terminer considered the Pennsylvania Mental Health Act of 1923 as supplying the exclusive remedy and would not exercise the common law right of the Court to appoint a lunacy commission.

17. See the comments of Mr. Chief Justice Kephart in the Senauskas case set

out in 326 Pa. at p. 72, 191 A. at p. 169.

18. The Supreme Court of Pennsylvania makes no reference to the provisions of the fifth paragraph of the Pennsylvania Mental Health Act of 1923, as amended May 28, 1937, 50 P.S.Pa. § 48, which provides that the Court of Oyer and Terminer sua sponte may designate some person to make an application to it for a commission to determine whether a defendant charged with a criminal offense is insane. We point out that there can be no question that if Smith had not been

(4) The relator contends that he was adjudged guilty of first degree murder without psychiatric or other evidence being received by the Court of Oyer and Terminer on his behalf. These allegations are summed up in the seventh paragraph of this opinion and seem to find substantial support in the evidence. Since we are without the benefit of findings of fact made by the court below relating to this important issue we cannot, of course, be certain that what the relator alleges in this respect is correct. In the absence of findings of fact, however, we must take those inferences from the record most favorable to Smith's contentions. The allegations of the petition must be taken to be true on this appeal. That there is a most substantial issue of fact, vitally affecting the disposition of the case at bar and one which should have been resolved by the court below, is beyond dispute as will appear.

Smith alleges that he changed his plea from "Not Guilty" to "Guilty" on September 21, 1948 and that he was adjudged guilty of first degree murder on that same day. The docket entries of some [19] of the proceedings in the Court of Oyer and Terminer printed in the record before the Supreme Court of Pennsylvania in the case of Commonwealth v. Smith, January Term 1949, No. 137, Smith's appeal from the judgment and sentence of the Court of Oyer and Terminer, are as follows: "Sept. 21, 1948. Court Room 453, present [Hon.] Charles L. Guerin, Hon. Joseph Sloane, and Hon. Vincent A. Carroll, en banc. Same day, the defendant with his counsel, the defendant withdraws his plea of Not Guilty and enters a plea of Guilty generally. Same day, after hearing testimony, both for the Commonwealth and the defendant, the defendant is adjudged Guilty of Murder of the First Degree."

In Commonwealth v. Smith, 362 Pa. 222, 223, 66 A.2d 764, in the opinion on appeal in the case referred to in the preceding paragraph, Mr. Chief Justice Maxey stated: "On the same day [September 21, 1948] he [Smith] was adjudged guilty of murder in the first degree by the court en banc, composed of Judges Charles L. Guerin, Joseph Sloane and Vincent A. Carroll." But in the opinion in the Ashe case, supra, 364 Pa. pp. 96, 112, 71 A.2d at pp. 109, 116–117, the Supreme Court of Pennsylvania said that the adjudication of guilty of murder of the first degree in Smith's case was made on February 4, 1949 and that this was shown by the docket entries. Mr. Chief Justice Maxey said: "Relator's counsel contend that Smith was denied due process of law because certain evidence as to his mental condition was taken *after* the Court had entered a judgment of guilty of murder in the *first degree* against him. The *docket entries* in this case show that judgment of guilty of murder in the first degree was entered on *September 21, 1948,* while the entries on the back of the bill of indictment (which entries are signed by Judges Guerin, Sloane and Carroll) show that the defendant was adjudged guilty of murder in the first degree on February 4, 1949." The Chief Justice went on to say: *"Whether this judgment was entered on September 21, 1948, or on February 4, 1949, is unimportant."* [20]

But attached to the supplemental appendix to the brief for the relator in this court are what purport to be photostatic copies of the face and the back of Smith's indictment. The second sheet referred to has been signed at its bottom by the three Judges who sat *en banc* in the Court of Oyer and Terminer. On it are a series of docket entries written in longhand. The first of these are the figures "9/21/48", this date being written on a separate line. Then follows: "Present Hon Charles L. Guerin, Hon Vincent A. Carroll, Hon Joseph Sloane the defendant with his Counsel, the de-

---

committed to prison, pending trial, the Court of Oyer and Terminer would have been compelled to inquire into his sanity on such a petition as was filed by his counsel or on a like petition filed by a member of his family. See the Act of July 11, 1923, P.L. 998, Art. III, § 304, as amended, 50 P.S.Pa. § 44. See again note 16, supra.

19. Neither this court, nor the court below, nor the Supreme Court of Pennsylvania has or had before it (insofar as the record shows) a complete transcript of the proceedings in the Court of Oyer and Terminer.

20. Emphasis has been added *only* to the last sentence quoted.

fendant withdraws his plea of Not Guilty and enters a plea of Guilty Generally." On the next following separate line are written the words "Eo Die". On the next following separate line comes: "after hearing testimony both for the Commonwealth and the defendant." Next, squeezed between the last preceding line and the next following line, lie the figures "2/4/49".[21] The effect of the position of these figures is to cut in half the normal space left between the lines. On the next following line are written the words *the defendant is adjudged guilty of murder of the 1st degree.*[21] On the next following line, which is normally spaced, comes the date "11/5/48". On the next two lines in order come the words "Additional testimony heard and held under advisement". Then follows on the next separate line the date "2/4/49". On the three next following lines is written: "In accordance with the above adjudication the defendant is sentenced to death in the manner provided by law". The signatures of the three Judges follow at the bottom of this page of the document as we have said. A copy of the pertinent part of this photostat is attached to this opinion as an appendix.

As presently informed we can see no way in which the adjudication of guilty of murder in the first degree, dated February 4, 1949, could have been placed *in proper order* between entries dated respectively September 21, 1948 and November 5, 1948. The entry of September 21, 1948, which states that Smith entered a plea of "Guilty Generally" corresponds with what we believe to be admitted facts as does the entry of November 5, 1948 which states that additional testimony was heard and held under advisement. But the insertion of the date "2/4/49" between the lines directly above the statement "the defendant is adjudged Guilty of Murder of the 1st degree" has a most dubious appearance and place. Unlike the other dates on the document, the figures "2/4/49" are thrust bodily into the middle of a sentence. If they were omitted, the lines would read "[A]fter hearing testimony both for the Commonwealth and the defendant the defendant is adjudged Guilty of Murder in the 1st degree." All of the sentence last quoted would fall under the date of September 21, 1948, the day on which the relator contends the plea of guilty generally was entered by him and the day on which, according to his assertion, he was adjudged guilty of first degree murder. The problem presented, however, is one of proof and the court below should have ascertained who wrote the words and figures and when and why they were written.

The question of when the Court of Oyer and Terminer entered the adjudication of guilty of first degree murder is of the utmost importance. Its impact on the vital issue of due process can neither be overestimated nor avoided. If Smith was found guilty of first degree murder on a plea of guilty generally without the Brooklyn State Hospital or other records or testimony on his behalf being received in evidence the conclusion that he was overreached is irresistible. See Commonwealth v. Johnson, 348 Pa. 349, 351–355, 35 A.2d 312, 313–315.[22]

21. Emphasis added.

22. Mr. Chief Justice Maxey said in Commonwealth v. Johnson, 348 Pa. at p. 353, 35 A.2d at p. 314: "We are reversing this judgment not because ex parte testimony was received by the court before it determined the sentence; we are reversing the judgment because the record does not show affirmatively that no ex parte evidence was received by the court before it determined and declared the degree of the defendant's guilt of murder."

It is the settled law of Pennsylvania that a general plea of "Guilty" to the charge of murder is not a plea of guilty of murder in the first degree. Commonwealth v. Jones, 355 Pa. 522, 525, 50 A. 2d 317, 319. Commonwealth v. Iacobino, 319 Pa. 65, 67, 178 A. 823, 825. Under the law of Pennsylvania an accused person cannot plead guilty to first degree murder. Commonwealth v. Berkenbush, 267 Pa. 455, 461, 110 A. 263, 265. See also 18 P.S.Pa. § 4701: "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall * * * impose sentence." Upon the court's acceptance of the plea of guilty the offense charged in the indictment, i.e., murder, is immediately established as murder in the second degree. If the Commonwealth desires to raise the degree, the burden is upon the Commonwealth to prove facts supplying the elements essential to the higher degree. Commonwealth v. Jones, supra.

It is the law of Pennsylvania that a judge of the Court of Oyer and Terminer sitting as the trier of the facts, *vice* a jury, must consider all the evidence before he may determine the guilt or innocence of the defendant. Commonwealth v. Barrish, 297 Pa. 160, 171, 146 A. 553, 556; Commonwealth v. Richman, 132 Pa.Super. 529, 532, 1 A.2d 578, 579. If the allegations of the petition in the instant case be true, the Court of Oyer and Terminer did not observe this fundamental principle insisted upon in the Barrish and Richman cases. The law of Pennsylvania is not unusual in this respect. It follows that of most, if not all, of the States, and of the United States. Townsend v. Burke, supra. See also such cases as People v. Whitman, 149 Misc. 159, 266 N.Y.S. 844, State v. Watts, 171 La. 618, 131 So. 729, and State v. Sample, 203 La. 841, 14 So.2d 678. The determination of guilt or innocence, whether based on the report of a lunacy commission or not, is absolutely void. State v. Sample, supra.

The evidence contained in the Brooklyn State Hospital records alone would have been sufficient to raise a jury question had the case gone to trial. This is so because, as we have said, Smith had been adjudicated insane by a court of competent jurisdiction. The Court of Oyer and Terminer was fully apprised of the possibility that Smith was insane. That Court must also have been aware of the fact that if Smith was insane, he could not competently plead guilty. To do so necessarily involved a waiver of trial by jury. The law of Pennsylvania requires a jury trial in murder cases unless jury trial is waived. But an insane man cannot waive jury trial. When the Court of Oyer and Terminer accepted Smith's plea of guilty and determined that Smith was guilty of first degree murder, it deprived Smith, if he was insane, of his constitutional right to trial by jury. The Petrillo decision, [Commonwealth v. Petrillo] 340 Pa. 33 at pp. 42–43, 16 A.2d 50 at p. 56, held that if there was a plea of guilty generally, a Three-Judge Court of Oyer and Terminer could find the degree of guilt without the intervention of a jury and

impose sentence. It was not the law—at least prior to the Ashe decision—that the doctrine of the Petrillo case could authorize a Three-Judge Court of Oyer and Terminer to determine the validity of a defense of insanity made by an *insane* defendant in a murder case. If Smith was insane, the Court of Oyer and Terminer acted without sanction of law or authority and did not accord due process.

Judge Guerin of the Court of Oyer and Terminer in testifying in the Court below [23] implied that there had been an understanding between counsel and the Court, that a time might come when it would be advisable in the interests of justice to cause the plea of "Guilty" to be withdrawn. Judge Guerin stated that such a time never came. It never came because the Three-Judge Court of Oyer and Terminer, upon hearing the evidence as to Smith's sanity or insanity determined that he was sane, not only at the time of the proceedings but also at the time of the commission of the crime. *In doing this the Court found the relator guilty of first degree murder.*

The majority opinion of this court assumes tacitly that procedural due process requires that when there is a prima facie showing of present insanity, the accused is entitled to some formal adjudication of his present sanity, viz., that the accused has the capacity to stand trial. Once this is assumed, the court is really on the horns of a dilemma. If the testimony as to Smith's mental condition was received by the Three-Judge Court of Oyer and Terminer only for the purpose of sentence as is alleged in the petition to have been the fact, there could have been no adjudication of Smith's capacity to stand trial. It would follow, therefore, that there was a denial of due process.

But if we assume, as do the majority, that there was in fact a formal adjudication of sanity to determine Smith's ability to stand trial and his guilt as well as to determine penalty, it is clear that the Court, rather than a jury, determined from evidence before it that Smith was guilty of murder in the first degree. The conclusion just ex-

pressed is based on that presumption most favorable to the Commonwealth, namely that Smith was found guilty of first degree murder on February 4, 1949. If he was found guilty on September 21, 1948, as the petition asserts, *a fortiori* Smith was denied due process of law for the three Judges of the Court of Oyer and Terminer, concededly, did not have the records of Smith's mental illnesses or any other evidence introduced on his behalf before them on that day and "an essential feature" of trial by jury within the purview of the Petrillo case was lacking. See 340 Pa. at p. 43, 16 A.2d at p. 56.

(5) As to the last point raised by the relator's petition, that asserting lack of due process because his counsel was not furnished with psychiatric assistance for the preparation of his case, as referred to in the eighth paragraph of this opinion, we point out that the Supreme Court of Pennsylvania in the Ashe case, 364 Pa. at p. 104, 71 A.2d at p. 113, indicated that there was no need to supply psychiatric assistance to Smith's counsel in order to enable him to prepare his defense. The Court stated, 364 Pa. at p. 105, 71 A.2d at p. 113, that no request was made by Smith's counsel for psychiatric assistance. The petition alleges, however, that "it being agreed * * * under Pennsylvania law court appointed counsel could not be provided with psychiatric examination and advice, it was further agreed * * * that the plea be changed to guilty." The Supreme Court of Pennsylvania went on to say that one of the judges of the Court of Oyer and Terminer testifying in the court below during Smith's first habeas corpus proceeding (M. No. 1334 in the United States District Court for the Eastern District of Pennsylvania) stated that "If a psychiatrist had been 'asked for' by defendant's counsel the defendant could have had a psychiatrist." This was not the attitude of the Court of Oyer and Terminer when Smith was before it for trial.

We do not say that in every capital case in which the defendant has been mentally ill and is indigent the court must appoint a psychiatrist to aid in the preparation of his defense. But if, as here, assuming the allegations of the petition to be true, there are grave indicia of mental disease, and it appears as well that counsel cannot prepare his client's case properly without the aid of a psychiatrist, one must be appointed by the court if due process is to be had. To require the appointment of counsel for an indigent accused is to require the appointment of counsel learned in the law, a member of the bar. The requirement of due process, as set out in Powell v. Alabama, supra, would not be met by the appointment of a layman as counsel. The appointment of counsel for a deaf mute would not constitute due process of law unless an interpreter also was available. Nor, in our opinion, would the appointment of counsel learned in the law fulfill the requirement of due process if that counsel required the assistance of a psychiatrist in order to prepare an insane client's defense.

In the Ashe case, 364 Pa. at page 110, 71 A.2d at page 116, the Supreme Court of Pennsylvania took the contrary view, holding in effect that the Commonwealth of Pennsylvania is and can be under no obligation to furnish psychiatric assistance to counsel appointed by the court in a capital case for any indigent defendant under any circumstances. According to the allegations of the petition [24] it was because court-appointed counsel agreed with the Court of Oyer and Terminer that psychiatric assistance could not be afforded to counsel that the agreement discussed under point (3), supra, was made. Counsel and the Court of Oyer and Terminer correctly stated the law of Pennsylvania. We conclude that if circumstances such as those alleged in the petition be proved to have existed, to deprive relator's counsel of psychiatric assistance was in fact to deprive the relator of the benefit of counsel.

The law of Pennsylvania has progressed far beyond the point where an indigent insane defendant in a capital case may be tried in the Courts of the Commonwealth without counsel to represent him. See again the Act of March 22, 1907, 19 P.S.Pa. § 784. Cf. Townsend v. Burke, 334 U.S. 736, 68

---

24. See paragraph 12, set out in note 5, supra.

S.Ct. 1252, 92 L.Ed. 1690. A modern and realistic approach to the problem of the insane defendant requires psychiatric assistance for his counsel at least under some circumstances. Concepts of due process change and as civilization progresses our ideas of fundamental fairness necessarily enlarge themselves. In Smith's case, where a most complicated history of insanity was presented, the relator's counsel may well have been at a loss to prepare an adequate defense without psychiatric assistance early in the proceedings. This is demonstrated by what actually took place. If the facts alleged in the petition be true and if the inferences most favorable to the relator be taken from the evidence Smith was overreached, however unintentionally, by the Commonwealth of Pennsylvania.

In conclusion upon the foregoing five issues of the case we point out that Section 2254, Title 28 United States Code, provides that the writ of habeas corpus shall not be granted to a person in custody of a State court unless it appears that he has exhausted his State remedies or that there is an absence of State corrective process or the existence of circumstances rendering such process ineffective. If any remedy or procedure be available under the law of the State a prisoner in custody of a State court must

avail himself of it.[25] Smith did not exhaust his State remedies following his conviction, for at that time he failed to make application to the Supreme Court of the United States for a writ of certiorari following the decision of the Supreme Court of Pennsylvania on his appeal from the judgment of conviction.[26] But as we have said Smith did make application for habeas corpus to the Supreme Court of Pennsylvania which refused the writ.[27] Smith then petitioned the Supreme Court of the United States for certiorari. This application was denied.

We think that the validity of Smith's conviction may now properly be tested by a writ of habeas corpus issued out of the court below for he has exhausted his presently available remedies in the Pennsylvania State courts.[28] See United States v. Warden of New Jersey Pen., 3 Cir., 187 F. 2d 615, 618. See Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761, comparing Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647, with Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572. In Bute v. People of State of Illinois, 333 U.S. 640, 649, 68 S.Ct. 763, 768, 92 L.Ed. 986, Mr. Justice Burton said that due process under the Fourteenth Amendment " * * * has reference to a standard of process that may cover many varieties of processes that are expressive of differing combinations of

25. Section 2254 of 28 U.S.C. provides that, "An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

The Reviser's Notes, 28 U.S.C., state in pertinent part, "This new section is declaratory of existing law as affirmed by the Supreme Court. (See Ex parte Hawk, 1944, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572.)" The Notes are to be re-

garded as authoritative in interpreting the meaning of the Code. United States v. National City Lines, 337 U.S. 78, 81, 69 S.Ct. 955, 93 L.Ed. 1226.

26. The decision of the Supreme Court of Pennsylvania on this appeal, as we have stated, is reported 362 Pa. 222, 66 A.2d 764, Commonwealth v. Smith.

27. The decision of the Supreme Court of Pennsylvania denying the writ, as we have said, is reported 364 Pa. 93, 71 A. 2d 107, Commonwealth v. Ashe.

28. The fact that Smith may apply for mandamus to compel Dr. Baldi to petition for the appointment of a commission to examine into his sanity under the Pennsylvania Mental Health Act, 50 P.S.Pa. § 48, as suggested by Mr. Chief Justice Maxey in Commonwealth v. Ashe, 364 Pa. 93, 113, 117–119, 71 A.2d 107, 115, 119–120, will not afford him adequate relief though it might avoid his imminent execution. Adequate relief for the relator would require a trial de novo.

historical or modern, local or other juridical standards, provided they do not conflict with the 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'" We are of the opinion that if the allegations of the petition are true, Smith has been denied due process of law as guaranteed him by the Fourteenth Amendment. We conclude that on the five points expressly raised by the relator the judgment of the court below should be reversed and the case remanded with the direction to reinstate the petition, to make appropriate findings of fact and conclusions of law, and to determine whether or not Smith was overreached by the Commonwealth of Pennsylvania.

There are other and broader aspects of the instant case, and indeed of all the proceedings relating to Smith, which have not been specifically touched upon by counsel for the parties in their able briefs largely, we believe, because they are sociomedical in their aspects. The following appears from the documentary evidence offered in the court below and we believe that the accuracy of our statements in this regard cannot be seriously questioned. We have referred to some of this evidence in somewhat general terms. We will endeavor now to be more specific.

Smith was born in poverty and was blinded at or shortly after birth. Later, he was cured. His father and mother had an unhappy domestic life and frequently were separated. He lived variously with his mother, his father and his grandfather. He had difficulty in learning to speak and, according to his mother he was "about five years old when you could understand him a little bit." When he did learn to talk, he stuttered. His mother said she knew "he was a funny child." At the age of nine he was sent to reform school for stealing a bicycle and, possibly, money. He was found to be a juvenile delinquent. After returning from the reformatory he was sent to a public school and reached the sixth grade. At some age, not clear from the record, he took to drink and smoking marijuana. He left school at the age of sixteen [29] and enlisted in the Army of the United States.[30] He was promoted to a sergeancy, serving in the "C.B.I." [31] theatre, but was hospitalized due to infection of the right eye, later developing an apparently unconnected gonorrheal infection. On three separate occa sions between December 1943 and his discharge [32] we note that he was subject to a "Nervous Condition" or to "Nervous Conditions". It is a fair inference that the nervous condition or conditions which afflicted Smith were the precursors of the schizophrenia which came upon him soon thereafter, if not the disorder itself. It is apparent that the actual diagnosis was not given.[33] In March 1945, within nine months of his discharge from the Army, Smith stole an automobile in New York so that he could return to Philadelphia.[34] He was brought before the Kings County Court on May 16, 1945, and was sent from there to the Kings County Hospital. There he was examined and on June 8, 1945, twenty-three days later, his disorder was diagnosed as schizophrenia, hebephrenic type. It was recommended to the court that he be committed to a hospital for the insane.[35] Dr. Adams of the Kings County Hospital reported: "It is our opinion that * * * Smith is presently insane,

29. For the foregoing see the testimony of Elsie Easton, the mother of the relator, Record on Appeal in the Supreme Court of Pennsylvania, pp. 196a–203a, and the testimony of Margaret Smith, the relator's sister, id. pp. 204a–208a.

30. June 26, 1941 is probably the correct date though several are given. See id. 141a.

31. China-Burma-India.

32. His discharge was "Other than Honorable". See the Statement of U. S. Army Medical History of Defendant, id. supra, pp. 166a–168a.

33. Contrast the vague phrases quoted with the definitions required to be employed in the United States Army. See the War Department Technical Bulletin, TB MED 203, pp. 3–15, prescribing in detail the method for recording diagnoses.

34. See the Record on Appeal in the Supreme Court of Pennsylvania, p. 130a.

35. See id., pp. 77a–80a, 81a–94a, testimony of Dr. Fred Adams.

not imbecile, and is not capable of understanding the charge against him, the proceedings against him, and of making his defense." Thereafter, making a formal adjudication of his insanity, the Kings County Court committed Smith to the Brooklyn State Hospital. That institution confirmed the diagnosis of schizophrenia made at the Kings County Hospital but concluded that it was of the catatonic type.

On September 21, 1945, Smith's condition was considered by the staff doctors of the Brooklyn State Hospital since it was thought he might be presented to the Court for discharge. The record of the staff meeting held on that date shows that three out of the four physicians who had observed him were of the opinion that he should not be released. One of them accurately predicted that "His lack of insight will undoubtedly lead to further difficulties because he has learned nothing by being sick." [36] The only dissenting physician concluded that while Smith showed schizophrenic symptoms he "is now at his pre-psychotic level". The conclusion of the staff concerning Smith was: "Patient is not well enough to be called recovered. Discharge deferred." Eighteen days later, on October 9, 1945, however, Dr. Clarence H. Bellinger, Senior Director of the Brooklyn State Hospital, examined Smith and two days later caused him to be discharged as "Recovered". Testifying before the Court of Oyer and Terminer Dr. Bellinger stated that he had found Smith to be "* * * sane and capable of understanding the charges pending against him and of conferring with counsel in the making of his defense * * *", and that "He was clear and lucid." [37] We do not know what disposition was made of the larceny charge by the Kings County Court after Smith was discharged from the Brooklyn State Hospital.

On December 27, 1945 Smith was taken at his request to the Naval Hospital in Philadelphia because he told a policeman that he was afraid he might kill someone. He was sent from the Naval Hospital to the Philadelphia General Hospital. A note on his admission record stated "he is homicidal". He was discharged on January 4, 1946 because he could be kept no longer than ten days on a self-commitment. The diagnosis on Smith's discharge from the Philadelphia General Hospital was "Acute Alcoholic Hallucinosis", but the value of this diagnosis is limited by the following qualifying statement of the Neuropsychiatric Department of the Hospital: "However, the Chief [of the Psychiatric Service] mentioned the possibility of Epilepsy, Petit Mal or Psychomotor Equivalent. * * * It is felt that electroencephalograms, along with a more detailed background social history, would have been helpful in establishing a more definite diagnosis." On this occasion no attempt was made to examine Smith further, or to commit this man of admitted homicidal tendencies.

How much time elapsed between Smith's dismissal from the Philadelphia General Hospital and the commission of his next crime is not clear from the record, but by February 3, 1946, less than one month later, according to a suggestion of the Assistant District Attorney, he was in Riker's Island County Penitentiary in New York. Here he was confined for a year. The Assistant District Attorney also suggested that Smith later stole a car in Philadelphia. This is not verified by the record, but it does appear that he was arrested on March 6, 1947 and later sentenced to the Philadelphia County Prison for a term of from thirty-two days to twenty-two months.[38] Efforts to secure information as to his mental condition during the year he was in the Riker's Island County Prison were unsuccessful. It does

36. See the heading "Discussion", Records of Brooklyn State Hospital, Record on Appeal in the Supreme Court of Pennsylvania, pp. 139a–140a. See in particular the statement of Dr. Terrence.

37. See the testimony of Dr. Bellinger, Rec-

ord on Appeal in the Supreme Court of Pennsylvania, pp. 94a–95a.

38. See the Record on Appeal in the Supreme Court of Pennsylvania, pp. 202a–203a.

not appear that any effort was made to ascertain Smith's mental state at the Philadelphia County Prison during the serving of this sentence. We do not know how long Smith was in jail on this occasion but we do know that he was free by December 1947 for he then stole the gun with which he shot and killed Haines. The summary of the periods during which the relator was under supervision, surveillance or restraint of some kind, as set out in the note below, will demonstrate that in all probability he has not been solely on his own responsibility for any period longer than nine months from the time when he was sixteen and joined the United States Army on June 26, 1941, until January 15, 1948, when he killed Haines.[39] Whether or not Smith was a schizophrenic at the time he committed the crime for which he is about to be executed, there can be no doubt that he showed at least one major characteristic of the schizophrenic, a complete inability to adjust himself to the requirements of a life without supervision. That he has shown many other similar characteristics can scarcely be doubted. The headless woman who stood by his bed at nights, the hallucinatory voices and the numerous signs of personality disintegration are symptomatic. He who runs may read.[40]

Indeed Smith's symptoms were almost classical. Dr. William Drayton, Jr., a psychiatrist called on behalf of the Court of Oyer and Terminer—indeed the only psychiatrist who testified as to Smith's condition after the commission of the crime for which Smith was sentenced to death—conceded that relapse occurred in about fifty percent of all schizophrenic cases. He stated: "I have seen them stay well for twenty years and I have seen them relapse within a year."[41] Dr. Drayton was of the opinion that Smith was mentally ill at least when he had himself committed to the Philadelphia General Hospital in the latter part of December, 1945. The Doctor testified in response to a question asked by the relator's counsel on cross-examination respecting acute alcoholic hallucinosis that: "This man [Smith] had been drinking heavily and he was a schizophrenic."[42, 43] Dr. Drayton reiterated his opinion that in 1945, at least, Smith was mentally unsound but that he had

39. An approximate calendar is as follows:

| | |
|---|---|
| | June 26, 1941 to June 28, 1944—United States Army |
| 9 months later | March 25, 1945 to October 11, 1945—Kings County and Brooklyn State Hospitals. |
| 2½ months later | December 27, 1945 to January 4, 1946—Philadelphia General Hospital |
| 1 month later | February 3, 1946 to February 3, 1947—Riker's Island County Penitentiary. |
| 1 month later | March 6, 1947 to ? —Philadelphia County Prison. December 1947—Stole gun used in killing John J. Haines. January 15, 1948—Killed John J. Haines. |

40. See Cameron, "The Psychology of Behavior Disorders", Houghton Mifflin Company, pp. 446–494; Overholser and Richmond, "Handbook of Psychiatry", J. B. Lippincott Company, pp. 136–149; Strecker, Ebaugh and Ewalt, "Practical Clinical Psychiatry", 7th ed., The Blakiston Company, pp. 265–296; Glueck, "Mental Disorder and the Criminal Law", Little, Brown and Company, pp. 354–382; Jenkins, "Nature of the Schizophrenic Process", Archives of Neurology and Psychiatry 64: 243–262; Menninger, "The Human Mind", Knopf, pp. 93–107; MacNiven, "Psychoses and Criminal Responsibility," Mental Abnormality and Crime, Macmillan and Co., Ltd., pp. 8–71.

41. See Record on Appeal to the Supreme Court of Pennsylvania, at p. 153a.

42. See id. at p. 150a.

43. Noyes, "Modern Clinical Psychiatry", 2 ed., W. B. Saunders Company, p. 469, points out that "There is much to suggest that the so-called 'acute' alcoholic hallucinosis has a schizophrenic basis and is not a purely alcoholic psychosis."

recovered "completely" from that illness.[44] Dr. Drayton took the position that Smith was faking and that he was an exhibitionist.[45] Dr. Drayton also reached the conclusion that Smith was able to tell the difference "between right and wrong."[46] In this connection one of the Judges of the Court of Oyer and Terminer called attention to Smith's attitude in the court room, that "* * * the working of his lips and all he is doing today was not in the case on the other two days [that Smith was in the court room]". This observation by the Court was objected to by the relator's counsel.[47] We cite it, not because we are of the opinion that the Court was not under the duty to observe the demeanor of Smith, for the contrary is true, but as indicative that the Court itself, on what we believe was insufficient evidence, expressed the opinion that the relator was faking and making an exhibition of himself in order to avoid just punishment.

By the foregoing we do not mean to suggest that Smith should not be executed for the murder of Haines if he was sane at the time of the commission of the crime, at the time of his plea of guilty generally, at the time he was found guilty of murder in the first degree and at present. As to his sanity or insanity on the two occasions first mentioned, the Court of Oyer and Terminer was in no position to express an opinion for it had received no evidence pertinent to these issues on the relator's behalf before Smith pleaded guilty generally. As to the third occasion, viz., when he was found guilty of first degree murder, there is a strong probability, as we have shown, that the Court of Oyer and Terminer had then received no evidence as to the relator's mental condition. If we are correct in these assumptions the Court of Oyer and Terminer was not entitled to an opinion that he was sane at this time. Bear in mind that the Court of Oyer and Terminer was not proceeding on the presumption that the accused was sane until he had proved the contrary. The Court did not say or suggest that it was proceeding on the basis that the relator was sane because he had not met the burden of proving himself to be insane. Actually, as we have shown, the Court entered into a bargain with Smith's counsel by which he pleaded guilty generally in return for an opportunity to procure from New York the records relating to his mental illness. But assuming *arguendo* that no bargain had been made, that Smith lost no right by the nature of his arraignment and that every step taken by the Court of Oyer and Terminer up to the time it received the testimony of Dr. Drayton was procedurally correct and did not involve any denial of due process, what constitutional limitations, if any, were imposed upon the Court of Oyer and Terminer by the nature of Dr. Drayton's testimony? It is apparent that it was largely upon Dr. Drayton's testimony that the Court of Oyer and Terminer concluded that Smith was sane at the time of the commission of the crime and throughout the periods when he appeared in Court, including the time when he testified as a witness in his own defense and at the time he was sentenced to death. As we have stated, it is the law of Pennsylvania that an insane person cannot be legally tried or sentenced. Commonwealth v. Ragone, supra, 317 Pa. at pp. 124–126, 176 A. at pp. 459–460. We believe that the weight of authority is in accord with the two propositions which we have just stated. An essential underlying principle is that if a court proceeds to an inquiry as to whether an accused is sane or insane and reaches a judgment in that inquiry, it must do so on sufficient probative data.

If a conclusion is reached on insufficient probative data ordinarily the result is mere error as distinguished from the denial of a constitutional right, but in Smith's case the error embraces a very much larger trajectory for Smith's mental condition went directly to his capacity to plead guilty generally and to the power of the Court to find him guilty of first degree murder and to

---

44. See Record on Appeal to the Supreme Court of Pennsylvania, at p. 158a.

45. See id. at p. 165a.

46. See, for example, id. at pp. 164a–165a.

47. See id., at p. 165a.

sentence him to death. If Smith was insane at the time of the commission of the crime or at the times he was adjudicated guilty of first degree murder or was sentenced to death, the Court of Oyer and Terminer did not possess the power to proceed with his case and to make the adjudications to which we have referred. The Supreme Court of Pennsylvania in its turn, if the assumptions which we have made be correct, also denied Smith due process of law in failing to assure to the relator his rights. See by analogy Johnson v. Zerbst, 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461. We are of the opinion that the data on which the Court of Oyer and Terminer proceeded and on which it rendered its judgment of execution was insufficient to sustain that judgment and that Smith was overreached by the Commonwealth also in this respect. Our reasons follow.

Dr. Drayton was the only psychiatrist and indeed the only physician who testified in the Court of Oyer and Terminer as to Smith's mental condition following the commission of the crime for which he was sentenced to death. But his examination of the accused had been an exceedingly limited one. Prior to giving his testimony, he had examined Smith on two occasions for "about an hour" in Smith's cell at the Philadelphia County Prison on November 3 and 4, 1948, about eight and a half months after the commission of the crime. The examination consisted largely of talking with Smith, observing his demeanor and reading his confession to him to discover whether or not he could distinguish between right and wrong. Dr. Drayton also had the advantage of information concerning Smith's condition given him by a guard in Smith's cell block at the Philadelphia County Prison who told him that the relator's behavior was normal.[48] Dr. Drayton had no electroencephalograms made, nor IQ, nor Rorschach tests, nor laboratory tests of any sort. He talked on one occasion with the prison

doctor. He had no consultations with any psychiatrist. He had further opportunity to observe Smith's condition while Smith was in court and testified or attempted to testify on his own behalf.

Weihofen, "Criminal Insanity", 48 Michigan Law Review, 961, at p. 975, states that the psychiatrist who, weeks or months after the crime, is called upon to determine the condition of the accused "is given a Herculean task". Dr. Strecker, Professor of Psychiatry, School of Medicine, University of Pennsylvania, an outstanding Pennsylvania psychiatrist and an associate of Dr. Drayton, in the book "Practical Clinical Psychiatry", written in conjunction with Drs. Ebaugh and Ewalt, 1951, devoted a chapter to "Methods of Psychiatric Examination". Dr. Strecker suggests as necessary tools which the psychiatrist should employ to determine the mental state of the individual whom he is examining, the following: A complete, well-taken history, a physical examination, a neurologic examination, examination of mental, sensorium and intellectual resources; he also stresses the importance of a laboratory examination, and recommends amytal interviews, and a skillfully interpreted Rorschach test. Strecker further states that "There should be no hesitancy in calling for adequate consultation with all of the other fields of medicine." Glueck asserts, "[T]he recovery rate [in schizophrenic cases] is extremely low. It [schizophrenia] may lead to almost any conceivable crime." [49] Most of these examinations cannot be conducted in a prison cell but require hospitalization. MacNiven states: "The illness [schizophrenia] is a very serious one. In the majority of cases recovery does not occur and many of the cases end in a state of profound dementia." [50] Cameron says, "The outcome, [of schizophrenic illness] unfortunately, to some extent justifies a gloomy therapeutic attitude." [51] It is also well established that

48. See Record on Appeal to the Supreme Court of Pennsylvania testimony of Dr. William Drayton, Jr., pp. 145a–166a.

49. See Glueck, "Mental Disorder and the Criminal Law", Little, Brown, and Company, at p. 354.

50. See "Mental Abnormality and Crime (Psychoses and Criminal Responsibility)", Macmillan & Co., Ltd., at p. 19.

51. See "The Psychology of Behavior Disorders", Houghton Mifflin Company at p. 459.

the incidence of schizophrenia among Negroes [52] is over three times as high as for native white persons of native parentage, and the urban is 2.1 times the rural rate.[53] It is also a demonstrable fact that slum areas of our metropolitan cities have several times as many hospitalized schizophrenic patients in relation to population as have the better residential areas.[54] In view of all the foregoing and if it be the fact that Dr. Drayton employed no more prolonged or searching methods of diagnosis than appears from the record, can it be said that the examination of Smith was an adequate one? On the present record we are forced to the conclusion that his examination by the psychiatrist appointed by the Court was insufficient to supply adequate probative data.[55] Smith was on trial for his life. He killed Haines under peculiarly brutal circumstances and the death penalty properly was imposed upon him if he was not insane. Alleged insanity, however, was his defense against death and if he was insane he does not merit the death penalty nor could it lawfully have been imposed upon him. The Commonwealth of Pennsylvania owed it to itself and to the defendant to employ adequate psychiatric methods to ascertain his mental condition. We are forced to the reluctant conclusion that the Commonwealth has not met this test.

It is the unfortunate fact, however, that some justification is to be found for less than a complete diagnosis of an accused's mental condition, his sanity or insanity, in the decisional law of most of the States, including that of Pennsylvania. Glueck has said: "If we were asked to name the outstanding characteristic of the law of insanity, as found in the cases in the various State reports, we would unhesitatingly answer,—confusion." [56] Most of the States make the sole test of legal irresponsibility the ability of the accused to tell the difference between right and wrong. A few States have added to the right and wrong test the so-called "irresistible impulse" test; viz., that the accused committed the criminal act because of an irresistible impulse which overwhelmed his will. A few more States add to the foregoing a "delusion" test. For instance, if an accused is so deluded as to suppose he is killing a supposed attacker, he may not be found guilty if his delusions had been fact and as such would have sustained a plea of self defense.[57] That these tests are very far from reality cannot, we think, be successfully disputed. Certainly, many competent medicolegal writers have so indicated and in our opinion they have proved their case. See for example Weihofen, "Insanity as a Defense in

---

52. Smith is a Negro.

53. See Malzberg, "Social and Biological Aspects of Mental Disease", State Hospitals Press.

54. See Faris and Dunham, "Mental Disorder in Urban Areas", University of Chicago Press.

55. Compare Dr. Baldi's examination of Smith and his attitude respecting the case. Dr. Baldi stated in his examination before Judge Welsh, United States District Court for the Eastern District of Pennsylvania, at Misc. No. 1334, pp. 319–321, on October 6, 1949, the second habeas corpus proceeding hereinbefore referred to: "The first day he [Smith] came in I made an examination of him and decided he should not be sent to a mental hospital but put in a cell as an ordinary prisoner." He was asked,

"What was his mental condition as you found it at that time?" He replied, "Normal, not insane; no occasion to have any further observation on him." On cross-examination he stated that he examined or talked with Smith altogether about "an hour and a half, because he was a normal case * * *." Id. at p. 341.

Dr. Baldi was asked, id. at p. 339, "Are the principles that you use in determining a man's sanity the same as those used by psychiatrists?" He replied, "By sane psychiatrists."

56. See "Mental Disorder and the Criminal Law", Little, Brown and Company, at p. 187.

57. See Digest of Cases, Weihofen, "Insanity as a Defense in Criminal Law", The Commonwealth Fund, New York, pp. 109–147.

Criminal Law", Chapter 1, Section 1, "What is Wrong with the Law?" [58], MacNiven, "Psychoses and Criminal Responsibility," Editorial Note to "Mental Abnormality and Crime", [59] and Zilboorg, "Mind, Medicine and Man", the chapter entitled, "Crime and Judgment".[60] A very large part of the confusion which almost invariably results in the trial of the criminal defendant alleged to be insane, lies in the fact that the law insists that the psychiatrist deal with mental states and conditions which do not exist save as legal conceptions.

In Pennsylvania as in many of the other States this difficulty arises because of a literal adherence to the opinion of the Lords in Daniel M'Naghten's Case, 8 House of Lords 200 (8 English Reports 718, X Clark and Finnelly 198), decided in 1843. Mr. Chief Justice Gibson's charge in Commonwealth v. Mosler, 4 Pa. 264, was drawn and based on M'Naghten's Case. This, we think, must be conceded.[61] M'Naghten's Case gave sanctity to the legal theory of "partial delusion", this phrase occurring again and again throughout the opinion. It was employed also as a fundamental principle by Mr. Chief Justice Gibson in the Mosler case. From this hundred year old conception, unchanged by the passage of time or the advance of science, grew the "right and wrong" test; i.e., the legal doctrine that the accused may be found guilty of murder if his state of mind was such that he could tell the difference between right and wrong. This doctrine plagues the law of Pennsylvania as it does that of most of the other States. M'Naghten's Case, like Mosler's case, assumes the existence of a "* * * logic-tight compartment in which the delusion holds sway leaving the balance of the mind intact * * *"; [62] the criminal retains enough logic in the tight compartment so that from this sanctuary of reason he may inform himself as to what the other part of his mind, the insane part, has compelled or permitted his body to do. If the sane portion of the accused's mind knows that what the insane part compels or permits the body to do is wrong, the body must suffer for it by way of electrocution or hanging, obliterating both the good and the bad portions, as well as the residence of both. It is no answer under the law of Pennsylvania to assert that the insane part of the mind overcame the sane portion and

58. The authority cited in note 57, supra.

59. "Mental Abnormality and Crime", Macmillan and Co., Ltd., respectively pp. 8–71, pp. 66–70 in particular, and pp. viii–xxiv.

60. See Zilboorg, "Mind, Medicine and Man", Harcourt, Brace and Company, pp. 246–297.

61. See the following Pennsylvania cases which we believe represent the law of Pennsylvania as it is today: Commonwealth v. Farkin, 1844, 2 Pars.Sel.Eq.Cas. 439; Commonwealth v. Freeth, 1858, 3 Phila. 105, 6 Am.L.Reg. 400; Ortwein v. Commonwealth, 1874, 76 Pa. 414; Sayres v. Commonwealth, 1879, 88 Pa. 291; Nevling v. Commonwealth, 1881, 98 Pa. 322; Coyle v. Commonwealth, 1882, 100 Pa. 573; Taylor v. Commonwealth, 1885, 109 Pa. 262, 271; Commonwealth v. Hillman, 1899, 189 Pa. 548, 42 A. 196; Commonwealth v. Wireback, 1899, 190 Pa. 138, 42 A. 542; Commonwealth v. Lewis, 1908, 222 Pa. 302, 71 A. 18; Commonwealth

v. Hallowell, 1909, 223 Pa. 494, 72 A. 845; Commonwealth v. DeMarzo, 1909, 223 Pa. 573, 72 A. 893; Commonwealth v. Snyder, 1909, 224 Pa. 526, 73 A. 910; Commonwealth v. Pacito, 1911, 229 Pa. 328, 78 A. 828; Commonwealth v. Calhoun, 1913, 238 Pa. 474, 86 A. 472; Commonwealth v. Cavalier, 1925, 284 Pa. 311, 131 A. 229; Commonwealth v. Schroeder, 1931, 302 Pa. 1, 152 A. 835; Commonwealth v. Szachewicz, 1931, 303 Pa. 410, 154 A. 483; Commonwealth v. Hollinger, 1899, 190 Pa. 155, 42 A. 548; Commonwealth v. Heidler, 1899, 191 Pa. 375, 43 A. 211; Commonwealth v. Werling, 1894, 164 Pa. 559, 30 A. 406; Commonwealth v. Sherer, 1920, 266 Pa. 210, 109 A. 867; Jones v. Commonwealth, 1874, 75 Pa. 403. All of these cases are cited in Weihofen's "Insanity as a Defense in Criminal Law", at pp. 137–139. See note 57, supra.

62. The phrase is Glueck's, "Mental Disorder and the Criminal Law", at pp. 169–170. See note 56, supra.

that therefore the body acted under an "irresistible impulse"[63] to commit the crime because irresistible impulse is no defense in Pennsylvania. See Commonwealth v. Schroeder, 1931, 302 Pa. 1, 152 A. 835. The human mind, however, is an entity. It cannot be broken into parts, one part sane, the other part insane. The law, when it requires the psychiatrist to state whether in his opinion the accused is capable of knowing right from wrong, compels the psychiatrist to test guilt or innocence by a concept which has almost no recognizable reality. We use the word "almost" advisedly for it is conceivable that the drooling, quaking, imbecile has no quality of mind whatsoever and therefore would not or could not know the difference between right and wrong. Such an individual would be unlikely to commit a crime since the commission of crime and some activity of mind and body seem inseparable.

The state of the law of Pennsylvania may have constituted the reason why Dr. Drayton, called and testifying on behalf of the Court, made repeated references to Smith's knowledge of right and wrong, and it may supply the answer as to why Dr. Drayton apparently made but small use of modern psychiatric tests, restricting himself largely to the method of asking Smith questions and receiving his answers. If Dr. Drayton had made the tests and examinations hereinbefore referred to, the data would have been of little value in answering the question which the Court of Oyer and Terminer was sure to pose and did pose: Did Smith know the difference between right and wrong? The Court in compelling the answer to this question was adhering to the law of Pennsylvania of over a hundred years standing.

It need not be always so. Changes can be effected and reason can be brought to the law of criminal insanity. The rule of M'Naghten's Case was created by decision. Perhaps it is not too much to think that it may be altered by the same means. If not, then legislation must prevail. Perhaps the M'Naghten rule may be modified by a Pennsylvania Court in this, Smith's, case.

In making this statement we are not unaware of the delicate balance which must be maintained between the States and the Federal Government and the reluctance which should and must be shown by a federal court in interfering with the considered judgments of State tribunals. Nor do we fail to appreciate the fact that any judge or member of the bar who suggests modification of the criminal law as it relates to insanity is, as a matter of course, accused of being upon the side of the criminal or of possessing a mawkish attitude. We think that the Scotch, however, are not a mawkish race; yet the Scotch law never burdened itself with the rule of M'Naghten's Case. The Scottish test of irresponsibility was expressed by Lord Justice-Clerk Inglis in 1863, as follows: "In a strictly legal sense, there is no insane criminal. Concede insanity and the homicidal act is not criminal. The act of the insane, which in the sane would be criminal, lacks every element of crime."[64] The Scotch rule remains substantially the same today. It is true that the word "insane" is not a precise term but the meaning of the Scotch rule is clear despite this. We can see no reason why the legal test of irresponsibility for the commission of a crime should not be based upon the principle that if the mental illness of the accused is the proximate, or a contributory cause of the crime, then the accused may not be found guilty of murder. With this finding, as an inevitable corollary, would go the commitment of an accused in Pennsylvania under-

---

63. The "irresistible impulse" doctrine and defense seems to us to be as illogical as the "right and wrong" test for it would seem that any impulse which is not resisted is by definition irresistible.

64. As quoted by MacNiven, "Mental Abnormality and Crime", in Chapter II, "Psychoses and Criminal Responsibility", Macmillan and Co., Ltd., at p. 60.

the Pennsylvania Mental Health Act of 1923, as amended, to an appropriate institution.

We are of the opinion that the judgment of the court below should be reversed and that the cause should be remanded.

9/21/48 [Affirmed]

Present: Hon. Charles L. Guerin, Hon. Vincent A. Carroll, Hon. Joseph Sloane. The defendant with his counsel, the defendant withdraws his plea of Not Guilty & enters a plea of Guilty Generally.

After hearing testimony both for the Commonwealth & the defendant the defendant is adjudged Guilty of Murder of the 1st degree.

11/5/48 Additional testimony heard and held under advisement.

7/4/49 In Accordance with the above adjudication the defendant is sentenced to death in the manner provided by law.

Charles L. Guerin ____ J.
Joseph Sloane ____ J.
Vincent Carroll, ____ J.